1            UNITED STATES DISTRICT COURT

2       EASTERN DISTRICT OF TEXAS (SHERMAN DIVISION)

3    UNITED STATES OF AMERICA,
                                    Case No. 4:21-cr-00253-ALM-
4              Plaintiff,           KPJ-13

5    v.                             Sherman, Texas
                                    May 8, 2023
6    SEGUN ADEOYE,                  12:55 p.m.

7              Defendant.

8

9            TRANSCRIPT OF DETENTION HEARING
        BEFORE THE HONORABLE CHRISTINE A. NOWAK
             UNITED STATES MAGISTRATE JUDGE
10

     APPEARANCES:
11   For the Plaintiff:          Jay Combs, Esq.
                                 U.S. Attorney's Office
12                               101 E. Park Boulevard
                                 Suite 500
13                               Plano, TX 75074

14   For the Defendant:          Cordt C. Akers, Esq.
                                 The Akers Firm, PLLC
15                               3401 Allen Parkway
                                 Suite 101
16                               Houston, TX 77019

17   Clerk/Court Recorder:       Karen Lee

18   Transcription Service:      Chris Hwang
                                 Abba Reporting
19                               PO Box 223282
                                 Chantilly, Virginia  20153
20                               (518) 302-6772

21

22

23

24   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

25

1

**INDEX OF WITNESSES**

2

3

| WITNESSES FOR PLAINTIFF | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Joseph Mathews | 8 | 25 | 46 | |

4

5

| WITNESSES FOR DEFENDANT | | | | |
|---|---|---|---|---|
| Gertrude Florent | 49 | 54 | | |

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**INDEX OF EXHIBITS**

2

3    <u>EXHIBITS</u>                                      <u>OFFERED</u>    <u>RECD</u>

        Defendant's 1 through 3                       27          27
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Call to order at 12:55 p.m.)

2              THE COURT:  All right, everyone, we're going to go

3      ahead and turn to the last cause on the Court's morning

4      criminal docket, 421-CR-253, the United States of America v.

5      Segun Adeoye.

6              If I can have an appearance on behalf of the

7      Government, please?

8              MR. COMBS:  Jay Combs for the United States, Your

9      Honor.  The Government's ready.

10             MR. AKERS:  Cordt Akers on behalf of Segun Adeoye.

11     We're ready.

12             THE COURT:  Thank you.

13             Sir, can you go ahead and state your full name again?

14             THE DEFENDANT:  Segun Adeoye.

15             THE COURT:  Thank you.

16             Everyone, I'm going to go ahead and re-cap where we

17     are in connection with Mr. Adeoye's detention issue.  If

18     everyone will remember, he first appeared on the Government's

19     Motion for Detention before myself.  At that time, I ordered

20     him released.

21             The Government appealed my order of release to the

22     district court and the district court ultimately disagreed with

23     my finding, revoked the order of release, the oral order of

24     release and ordered Mr. Adeoye detained.

25             His opinion is set forth in Docket Number 403.  He

1   found by preponderance of the evidence that Mr. Adeoye should

2   be detained and cited the following testimony and evidence from

3   hearing that this Defendant has ties to two other co-defendants

4   Popnen and Iribhogbe.  He had over 50 contacts with those two

5   Defendants and that there was a wire transfer from Iribhogbe to

6   the Defendant in the amount of $43,000 that then went outgoing

7   from the Defendant's account to an account in Japan.

8          That Mr. Adeoye was born in Nigeria, continued to

9   have parents and two siblings living there.  He had last

10  travelled to Nigeria in 2013, that he was a lawful permanent

11  resident of the United States, that he was a practicing

12  physician with access to cash and other substantial assets.

13         Judge Mazzant noted in addition to my finding, Mr.

14  Adeoye should be released, that Pre-trial Services had

15  recommended release.

16         Notwithstanding, he concluded that the preponderance

17  standard had been met and specifically his conclusion was as

18  follows.

19         Notwithstanding Pre-Trial Services' recommendation,

20  the testimony of the Defendant's witness, and the magistrate

21  judge's order of release, having considered the nature of the

22  offense in conjunction with the evidence adduced at the

23  detention hearing, the Court concludes by preponderance of the

24  evidence that the Defendant would pose a risk of flight if

25  released.  That order was issued January 11th of 2022 and Mr.

1    Adeoye has remained in custody since then.

2              Subsequent to that time, Mr. Adeoye's counsel filed a

3    motion requesting to re-open the issue of detention.

4              And I think the history here is important as well.

5    Judge Johnson actually signed an order granting the Defendant's

6    Motion to Re-open Detention Hearing and ordered that the matter

7    of detention of in fact re-opened and set a detention hearing

8    for herself.  That hearing was originally set for Tuesday,

9    April the 25th.

10             Subsequent to that, Judge Johnson chamber's cancelled

11   the detention hearing that was scheduled for Tuesday, April the

12   25th.

13             Upon such cancellation, my chambers reached out to

14   Judge Mazzant to inquire as to whether or not his chambers were

15   going to set the matter for detention given the procedural

16   posture of the case and/or whether or not we were directed to

17   proceed in holding Mr. Adeoye's detention hearing.

18             The district court chambers has instructed us to hold

19   the hearing.  And as a result, we're scheduled here.  The

20   Motion to Re-open having already been granted by Judge Johnson

21   for the issue of detention.

22             I'm going to go ahead and just ask the Government to

23   confirm, have I accurately stated the somewhat convoluted

24   procedural posture that brings us here today?

25             MR. COMBS:  You have, Your Honor, thank you.

1    THE COURT:  And Defense counsel, do you concur?

2    MR. AKERS:  I do.

3    THE COURT:  All right.  I know that we're still

4 working to get the projector working and the Government has

5 advised that they need it for purposes of the hearing, but I

6 think we're prepared to go forward with the Government's first

7 witness.

8    Otherwise, if I can go ahead and invite Mr. Akers,

9 you and your client to please be seated.

10    MR. COMBS:  Your Honor, I'll call my witness.  And if

11 I may just very briefly approach, I'll try and plug in my

12 computer from the table there.

13    THE COURT:  That sounds lovely, Mr. Combs, thank you.

14    MR. COMBS:  So the Government calls Special Agent

15 Joseph Mathews.

16    THE COURT:  Hey, Karen?  Hold on just a second.  Can

17 you swear him and then we'll work on the -- all of the IT

18 issues that we're having today.

19                        JOSEPH MATHEWS

20  called as a witness for the Plaintiff, having been duly sworn

21                     testified as follows:

22    THE COURT:  It's lovely, isn't it?  All right, so I'm

23 going to go ahead and ask a favor.  Go ahead and state your

24 full name into that microphone and then spell it as well for

25 our record that is currently working.

1          THE WITNESS:  Yes, ma'am.  Special Agent Joseph

2    Mathews, J-O-S-E-P-H.  Last name spelling M-A-T-H-E-W-S.

3          THE COURT:  Thank you.

4          All right, so Mr. Combs, obviously --

5          MR. COMBS:  Yes.

6          THE COURT:  -- our technological issues are not

7    limited to just the FTR today.  It appears that our projector

8    is also choosing to go forward with it being a Monday.

9          MR. COMBS:  Yes.

10          THE COURT:  Are you able to go forward without it?

11          MR. COMBS:  I am, Your Honor.  That's fine.  We'll

12    proceed without it.  And I'll just argue based on the facts.

13                        **DIRECT EXAMINATION**

14    BY MR. COMBS:

15       Q    So, sir, you've already stated your name.  How -- are

16    you familiar with a case involving a Segun Patrick Adeoye?

17       A    Yes, sir.

18       Q    Do you see Mr. Adeoye in the courtroom?

19       A    Yes, sir, I do.

20       Q    Can you describe where he's sitting and what he's

21    wearing?

22       A    He's sitting at next to Defense counsel in a black

23    and gray jumpsuit.

24          MR. COMBS:  Your Honor, may the record reflect the

25    witness has identified the Defendant?

```
 1                   THE COURT:  The record shall so reflect.

 2    BY MR. COMBS:

 3        Q    Are you -- have you been involved in the

 4    investigation of a case involving Mr. Adeoye?

 5        A    Yes, sir.

 6        Q    What's your role in that -- in that case?

 7        A    I'm one of the lead case agents on this case.

 8        Q    Okay.  And you did not testify at the earlier

 9    detention of Mr. Adeoye; is that right?

10        A    That's right, sir.

11        Q    But you've testified at a number of detention

12    hearings in this case because it's a multi-defendant

13    indictment?

14        A    Yes, sir, that's right.

15        Q    And you specifically did testify to the facts, the

16    underlying facts in this case in front of Judge Nowak?

17        A    That's correct.

18        Q    Do you know who the agent was who testified at the

19    original detention hearing?

20        A    Special Agent Keane Richardson.

21        Q    And are you familiar with his testimony?

22        A    Yes.

23        Q    Would you adopt it for the purposes of this hearing?

24        A    Yes.

25        Q    Okay.  So, sir, the issues before the Court today
```

 1    based on the Defendant's Motion to Re-open, are you familiar

 2    with the issues that they've raised?

 3         A    Yes.

 4         Q    And are -- do you know that one of the issues that

 5    they've raised is that Mr. Adeoye has only $43,000 of offense

 6    conduct or offense conduct.  That is, his involvement in the

 7    case is limited to $43,000.  Are you aware that they've raised

 8    that issue?

 9         A    Yes.

10         Q    Do you agree with that assessment?

11         A    No.

12         Q    Why not?

13         A    Because that is just a dollar amount that was

14    funneled through his account.  There is more intended loss.

15    There are multiple victims with a larger dollar amount.  And

16    there's also discussions of other dollars that were supposed to

17    have went through his account.  So it wasn't just the 43,000.

18         Q    How much was -- you said that there was an intended

19    loss.  The 43,000 transferred, did that begin as something that

20    was actually larger?

21         A    Yes.

22         Q    And how much was it?

23         A    I believe approximately 80,000.

24         Q    Okay, and your aware that Mr. Adeoye is charged with

25    conspiracy; is that right?

1          A     Yes.

2          Q     And that when sentenced under a conspiracy, you're

3    responsible for what is intended; is that right?

4          A     That's correct.

5          Q     And now, and also, what is reasonably foreseeable to

6    you.  That is, what other co-conspirators do that is reasonably

7    foreseeable to you; is that right?

8          A     Yes.

9          Q     Okay, so let's stay with the intended prong because

10   you mentioned that there was a -- an intent to at the beginning

11   of the transaction that it be more than 43,000.  And again,

12   what -- how much did you say that amount was?

13         A     The first was 80,000.

14         Q     80,000.  And was there later a transaction or a

15   transaction that was begun or discussed that was never later

16   consummated to your knowledge?

17         A     Yes.

18         Q     And how much was that?

19         A     Not sure on the total dollar amount, but between the

20   43- and the additional, it was around 50-.  So in the 93- to

21   95- range, 95,000, somewhere around there.

22         Q     $95,000 range.  So, right there, we have 80,000 and

23   the 95,000, give or take around 175,000; is that right?

24         A     Yes.

25         Q     And that's significantly more than the 43,000 that

1    Mr. Adeoye sent to a Japanese fish restaurant?

2        A    Yes.

3        Q    Okay, or fish dealer.  Is it --

4        A    An importer, exporter, sir.  Yes, sir.

5        Q    Okay, and the $175,000, is it is -- is there a

6    potential that Mr. Adeoye's intended loss amount or that that

7    was reasonably foreseeable to him could go significantly higher

8    than that?

9        A    Yes.

10            MR. AKERS:  Objection.  Calls for (indiscernible).

11            THE COURT:  I can't hear you unless you're at the

12    microphone.

13            MR. AKERS:  I'm going to object.  That calls for a

14    legal conclusion on the part of this witness.

15            THE COURT:  I'm sorry, Mr. Combs, can you re-state

16    the question?

17            MR. COMBS:  The question was is it possible that the

18    amount that was reasonably foreseeable to Mr. Adeoye could go

19    significantly higher --

20            THE COURT:  I'll allow the witness to answer the

21    question to the extent he's able.

22            THE WITNESS:  Yes, sir.

23    BY MR. COMBS:

24        Q    And what is the total loss amount that you're aware

25    of right now involving this conspiracy?

1    A    The floor is 9 and a half to 25 million.

2    Q    Between 9 and a half to 25 million.  Could that go up

3  as time goes on?

4    A    Yes.

5    Q    Okay.  Let's talk about where did that 9 and a half

6  to 20 million came from.  Who were the victims in this crime?

7    A    There are multiple victims, some of which we are

8  still identifying, vulnerable victims, elderly individuals,

9  romance scams, the unemployment insurance fraud, state

10 governments, business email compromise, tax fraud, the gamut.

11   Q    Okay, now have you -- are you aware of the United

12 States Sentencing Guidelines?

13   A    Yes.

14   Q    I'm publishing now Government Exhibit 1, which do you

15 recognize that?

16   A    Yes.

17   Q    You didn't prepare that, did you?

18   A    No, sir.

19   Q    That was something I prepared; is that right?

20   A    Yes, sir.

21   Q    And I reviewed it with you, though; is that right?

22   A    Yes.

23   Q    And you've previously discussed the Guidelines with

24 Ms. Rattan, lead counsel in this case; is that right?

25   A    Yes.

1      Q     And how various enhancements may or may not apply to

2   Mr. Adeoye's case?

3      A     That's correct.

4      Q     Okay.  And we were talking about vulnerable victims.

5   Now that is the 3A1.1(b)(1) and (b)(2) enhancements down near

6   the bottom there.

7      Describe for the Court, you said there were vulnerable

8   victims, describe for the Court if you would why you believe

9   those victims were vulnerable?

10     A     Well, in several cases in this investigation, we've

11  had elderly individuals who were widowed, very up in their

12  years, were taken advantage of, where their life savings was

13  stolen.

14     We have a few that have lost their homes, who actually

15  sold their homes to be able to pay their loan interest off to

16  be able to hopefully one day meet their love interest who

17  they've never met before online.

18     Q     Are you familiar with an individual by the name of

19  General Rodriguez (phonetic)?

20     A     Yes.

21     Q     And is United States Army General Retired Rodriguez

22  an actual person?

23     A     Yes.

24     Q     He was a fairly prominent figure at one time in the

25  U.S. military; is that right?

1      A      Yes.

2      Q      And he was in the news on occasion, because of his

3  involvement in large-scale military operations including Iraq?

4      A      Yes, sir.

5      Q      So he -- did one of the victims believe that they

6  were communicating with General Rodriguez?

7      A      Yes.

8      Q      Why did they think they were communicating with

9  General Rodriguez?

10     A      They had used General Rodriguez's likeness.  When I'm

11  saying they, the perpetrator, the one who is scamming the

12  elderly individual used General's -- the General's likeness on

13  an application to portray themselves as this -- as the General

14  to be able to woo and to be able to gain the confidence of the

15  victim.

16     And which ultimately leads to the victim believing they're

17  in a relationship online and giving their life savings, giving,

18  you know, money to these individuals.

19  BY MR. COMBS:

20     Q      Okay, and General Rodriguez is now probably not

21  elderly, but he's older now; is that right?

22     A      Yes, sir.

23     Q      And so this person thought that the victim was an

24  elderly person who thought they were now in a relationship with

25  General Rodriguez and gave their money to them?

1    A    Yes.

2    Q    In fact, they were giving their money to the

3  conspiracy; is that right?

4    A    Yes.

5    Q    And so, will it be your argument to the district

6  court at the time of sentencing that there were vulnerable

7  victims?

8    A    Yes.

9    Q    Obviously, that'll be up to the district court to

10  make that decision; is that right?

11    A    Yes.

12    Q    By a preponderance of the evidence.  And do you

13  believe or will you argue to the Court that there was a large

14  number of vulnerable victims?

15    A    Yes.

16    Q    Why?

17    A    Because the conspiracy, we arrested 40 individuals

18  with the Northern and Eastern District case.  We have a cross-

19  over between those cases.  We have so many victims that have in

20  this case, unfortunately, the more that we look into the

21  finances, we find many, many victims that have sent money

22  straight to -- have been, you know, have been taken advantage

23  of in a romance scam, sent money to their love interest, or

24  were told to send their accounts that were in this -- held by

25  the people in this investigation.

1      Q    And how about the sophisticated means?  Will -- at

2    time of sentencing, will you ask the Court if you're called to

3    testify to apply sophisticated means enhancement to this

4    Defendant?

5      A    Yes.

6      Q    Why would you ask that?

7      A    There are several reasons.  One, it's the way that

8    the victims are groomed to be able to be stolen from.  Then

9    it's the rapid movement of funds using encrypted apps, using

10   business bank accounts that are actually businesses then to

11   move the money out of the country very quickly to be able to go

12   undetected by law enforcement.

13     Q    And the means that are used and the sophistication of

14   the underlying fraud, let's go back to the General Rodriguez

15   example.  Did the victim in that case also believe they were

16   communicating with an attorney for General Rodriguez?

17     A    Yes.

18     Q    Okay, and describe that if you would?

19     A    What we've seen in this investigation, once an

20   individual who is a victim is for lack of a better term on the

21   hook and communicating and now has believed they're in a

22   relationship, many times, they will bring in a third-party.

23   They'll bring in somebody else that there's a problem overseas

24   or there's a problem that their love interest has.

25        And they'll bring a third-party in, the perpetrators will

1    bring a third-party in, which is sometimes even the same person

2    just acting as somebody else to be able to get more money to be

3    able to bring the story along, the story line with the victim

4    along, so that they can steal more money from the victim.

5        Q    Okay, and you say they stole money.  Did they steal

6    money from individual victims?

7        A    Yes.

8        Q    So, based on all that, if the Court agrees with your

9    assessment on these things and, of course, it's up to the

10   district court, but if the Court agrees with your assessment,

11   what do you believe Mr. Adeoye is facing?  What do you believe

12   his Guidelines are just under the $43,000, not taking into

13   account the 175- to really to 9,000,000 that we discussed, but

14   if you're just under 43,000, what do you believe his Guideline

15   level to be?

16       A    Based on this Powerpoint, 37 to 46 months.

17       Q    Okay, and that is significantly longer than he's

18   already been in custody; is that right?

19       A    Yes.

20       Q    Okay.  Now could that significantly increase if the

21   Court agrees with you that this was, you know, 175,000 or

22   potentially even up to 9,000,000 or more, would that amount

23   increase significantly?

24       A    Yes.

25       Q    And this offense has a 20-year maximum; is that

1    right?

2        A    That's correct.

3        Q    Now this is just Count 1.  And we're -- this was the

4    19 or 1349, that is the conspiracy to commit wire fraud count;

5    is that right?

6        A    Yes.

7        Q    And there's also a second count that involves the

8    Defendant Mr. Adeoye.  And that's money laundering conspiracy,

9    right?

10        A    Yes.

11        Q    And it's got some more calculations, is that fair?

12        A    Yes.

13        Q    Okay.  Sir, I'd like to talk to you.  We've talked a

14    bit about the amount of time Mr. Adeoye is facing.  And you

15    know, people face the time that they're facing.  They go to

16    trial or not.

17        But sometimes people have nowhere to go.  If they're, you

18    know, they don't have much of a choice, but to face the crime

19    in front of them.  Does Mr. Adeoye have anywhere to go?

20        A    Yes.

21        Q    And where would that be?

22        A    He has family in Nigeria.

23        Q    He has family in Nigeria?

24        A    Yes.

25        Q    Has he lived in Nigeria during this span of his life?

```
 1        A    Yes.

 2        Q    Significant amount of time in Nigeria?

 3        A    Yes.

 4        Q    In fact, most of his life, he's lived in Nigeria, is

 5   that the majority, is that fair?

 6        A    Yes.

 7        Q    Okay.  And Mr. Adeoye is not a United States citizen;

 8   is that right?

 9        A    That's correct.

10        Q    So he's a lawful permanent resident?

11        A    Correct.

12        Q    If convicted of a felony offense like this, are you

13   aware of whether Mr. Adeoye could potentially be deported from

14   the United States?

15        A    That's correct. .

16        Q    And would it be your recommendation that he -- do be

17   deported from the United States?

18        A    Yes.

19        Q    That he be deported?

20        A    I'm sorry, sir, yes, sir.

21        Q    And are you familiar with the difficulty in getting

22   Defendants extradited from Nigeria on economic crimes?

23        A    Yes.

24        Q    Describe that for the Court if you would?

25        A    I haven't personally tried, but in this investigation
```

1    in talking with individuals, it's been very difficult to

2    extradite for these types of crimes from the nation state of

3    Nigeria to the United States.

4        Q    Okay, and so you believe that would be a difficult

5    task?

6        A    Yes.

7        Q    Could take years if it ever happened at all?

8        A    Yes.

9        Q    And are there real victims in this case?  You've

10   talked about the victim related to General Rodriguez's, the

11   scam involving his name and that there are a large number of

12   victims.  Those aren't just numbers on a page; is that right?

13       A    That's correct.

14       Q    Those are real people who gave of their fixed incomes

15   because they thought they were in a romance?

16       A    Yes.

17       Q    And is it your goal or your hope to try and make

18   those individuals whole?

19       A    Yes.

20       Q    Okay.  And if Mr. Adeoye were to flee the United

21   States and flee justice, could that hamper your ability to

22   ultimately make these Defendants whole?

23       A    Yes.

24       Q    Or these victims whole rather?

25       A    Yes.

1       Q    Why?

2       A    Because he wouldn't stand -- he wouldn't stand trial

3   for his conviction.  And then, also restitution that comes once

4   they're sentenced, these individuals are sentenced that goes

5   back, you know, recognizing that they're never going to be

6   fully whole as far as dollar amounts, but at least something

7   to -- for solace for them.

8       Q    So some bank accounts were seized; is that right?

9       A    Yes.

10      Q    And a preliminary order of forfeiture can be issued

11  at the time somebody has been found guilty; is that right?

12      A    That's correct.

13      Q    And when they're sentenced, the final order of

14  forfeiture can be issued; is that right?

15      A    That's correct.

16      Q    And so then, at that point, then there can be steps

17  taken to make some victims whole or at least try to help them

18  in any way they can, so they can buy food and live their lives

19  with some money; is that right?

20      A    Yes.

21      Q    And -- but until a person's found guilty, not even a

22  preliminary order of forfeiture can be granted; is that right?

23      A    That's correct.

24      Q    There's a -- the funds can be marked and they can be

25  held, but they can't be forfeited until such time as a finding

1    of guilt has been made, correct?

2        A    That's right, yes, sir.

3        Q    And you -- but you want to make those victims whole?

4        A    Yes, sir.

5        Q    And also, as you kind of noted, the victims, they

6    have a right to justice, right?

7        A    Yes, sir.

8        Q    And would they -- would justice be done if Mr. Adeoye

9    were to just self-deport and say, okay, I'll never come back to

10   the U.S.  I'm just -- I'm going to leave?

11       A    No.

12       Q    And there -- it's small solace, but there is some

13   solace in a victim when somebody is convicted of the crime that

14   they're a victim of; is that right?

15       A    Yes, that's a common conversation as we're finding

16   all these victims that they understand -- well, some of those

17   who understand that they are victimized, we still have some

18   that don't believe they were victimized, that just don't want

19   to believe that lie.

20       But that's the one thing that they talk about, well, is

21   this person in jail?  Do you have anybody in jail, because

22   they're looking for some kind of closure, when it comes to what

23   they've lost.

24       Q    Okay.  And finally, sir, is it possible that in

25   addition to the potential increase of the sentencing

1    calculations based on the dollar amount, that Ms. Rattan or

2    others involved in the case could actually seek an upward

3    departure, you know, based on the scope, the scale of the

4    conspiracy, and other factors like victim-related factors?

5        A    Yes.

6        Q    Okay, thank you.

7            MR. COMBS:  Your Honor, pass the witness.

8            THE COURT:  Mr. Akers, sir?

9            MR. AKERS:  Yes, Your Honor.

10           THE COURT:  Mr. Akers, before you proceed, I have

11   omitted and I needed to make sure in terms of procedural

12   history that I laid out some additional facts.  And so, I'm

13   going to go ahead and do that now.

14           Docket 670, which was Mr. Adeoye's Motion to Re-Open

15   Detention Hearing, Docket 670 was filed on March the 30th.

16   Local Rule CR 47(b) allows 14 days for the filing of a

17   response.  Judge Johnson's order granting the Motion to Re-Open

18   Detention Hearing was at Docket 683 and was entered on April

19   the 18th.

20           Only after the entry of that order was any response

21   late filed by the Government being Docket 684.  There's also an

22   additional later filing, 686, which also relates to the

23   underlying changed circumstance that Mr. Adeoye alleged in the

24   Motion to Re-Open Detention Hearing, which was a statement that

25   he purported exonerated him.

1          That obviously was considered by Judge Johnson in

2     connection with the re-opening.  And the Court here today is

3     considering the detention factor.

4          So I'll just ask for everyone to please focus on

5     those detention factors, but that further outlays the

6     procedural history related to Judge Johnson's entry of that

7     order.

8          All right, and with that sir, you may go forward.

9          MR. AKERS:  Thank you, Your Honor.  If it please the

10    Court.

**CROSS-EXAMINATION**

12    BY MR. AKERS:

13    Q    Agent Mathews, nice to see you again.  Could you tell

14    me every instance that Segun Adeoye in writing was informed

15    about someone named General Rodriguez?

16    A    Say that again, sir, sorry?

17    Q    Could you tell me every instance that Segun Adeoye

18    was informed about someone named General Rodriguez?

19    A    And you said in writing?  I don't have one of those.

20    Q    No information about him being informed about General

21    Rodriguez's lawyer either, correct?

22    A    No.

23    Q    No information about him being informed about that

24    vulnerable victim K.H., correct?

25    A    No.

 1      Q     In fact, nowhere in writing is Segun Adeoye ever

 2   informed about where money that went into his account came

 3   from; is that correct?

 4      A     Not to my knowledge.

 5      Q     So that is correct, you do not have any information

 6   to show in writing that Segun Adeoye was told where that money

 7   came from?

 8      A     Not in writing.

 9      Q     Okay.

10           MR. AKERS:  May I approach the witness?

11           THE COURT:  You may.  Have you shown opposing counsel

12   what you'll be showing the witness?

13           MR. AKERS:  I have not.

14           THE COURT:  And Mr. Combs, that actually begs the

15   question, did you provide Mr. Akers a copy of that slide?  If

16   you are able to provide it to him, the Court would be

17   appreciative.

18           MR. COMBS:  I emailed it, sir.

19           THE COURT:  Thank you.

20           MR. AKERS:  He -- it's --

21           MR. COMBS:  I let him see it.

22           MR. AKERS:  He let me see it.

23           THE COURT:  Okay, you may approach the witness now.

24   BY MR. AKERS:

25      Q     Handing you Defendant's Exhibit 1 through 3.  One is

1   an email chain that you're on.  2 is the attachment to that

2   email chain.  And number 3 is the letter from Edgal Iribhogbe.

3   Have you seen all these three documents?

4       A   The emails, yes; the indictment, yes; and I'm aware

5   that there's a letter, yes, sir.

6           MR. AKERS:  Okay, we'll offer Defendant's Exhibit 1

7   through 3.

8           THE COURT:  Any objection?

9           MR. COMBS:  No, Your Honor.

10          THE COURT:  There being no objection.  They shall be

11  admitted.

12      (Defendant's Exhibits 1 through 3 admitted into evidence)

13          MR. AKERS:  If I can stay with you here.  So --

14          THE COURT:  Just remember, I can't hear you if you're

15  standing that far away from a microphone.  So you're going to

16  have for get up close --

17          MR. AKERS:  Sure.

18          THE COURT:  -- up close with that witness right there

19  if you're going to stay right there, okay?

20          MR. AKERS:  Thank you.

21          THE COURT:  All right.

22  BY MR. AKERS:

23      Q   Who's more familiar with the loss amount in this

24  case, you or Heather Rattan?

25      A   I'd say we're pretty equal on that.

1    Q    Okay.  You can see in this email that Ms. Rattan

2    sends a message asking me if we're going to go do a plea or do

3    a trial?  Do you remember?

4    A    Yes.

5    Q    Is that correct?

6    A    That's correct.

7    Q    And she said that there was a possibility that Dr.

8    Adeoye was approaching time served on the loss amount; is that

9    correct?

10   A    That's correct.

11   Q    And then, she subsequently sent a plea agreement with

12   the loss amount of $43,000, correct?

13   A    For the plea.

14   Q    Correct.

15   A    Yes.

16   Q    After saying that she's approaching time served for

17   the loss amount, right?

18   A    For the $43,000 loss amount.

19   Q    Okay.  And then --

20        THE COURT:  Hold on, Mr. Akers.  If you're standing

21   right there, you're in no man's land.  And this is record will

22   not pick you up.  It's the downside of not having a court

23   reporter.  So you're going to have to be at that microphone or

24   that microphone and I don't care which, but if you can please

25   approach one of them.

1          MR. AKERS:  I'll run back and forth, Judge.

2          THE COURT:  Thank you.

3    BY MR. AKERS:

4      Q    And then, of course, that is what is contained in

5    that plea agreement, right?

6      A    That's correct.

7      Q    As far as what was seized from him, one of the things

8    that you all noted in the thinking he was a flight risk was

9    substantial assets, correct?

10     A    Yes.

11     Q    Lots of cashier's checks going in and out everywhere,

12   right?

13     A    Yes.

14     Q    And in your -- the bill of particulars in this case

15   of supplemental notice of forfeiture, there were several

16   cashier's checks seized from Dr. Adeoye, correct?

17     A    No, we responded on that one, but there were --

18     Q    Right.

19     A    -- receipts of cashier's checks.

20     Q    Right, but so what's in this bill of particulars, I

21   think it's close to 50, 60 grand in cashier's checks is

22   actually just receipts or pictures for checks, right?

23     A    It's receipts of cashier's checks that he had had,

24   yes.

25     Q    And then also, the -- an entire bank account was

 1    seized upwards of that $43,000 loss amount, correct?

 2         A     Yes.

 3               MR. AKERS:  So if -- can we pull up that Powerpoint

 4    thing real quick?

 5    BY MR. AKERS:

 6         Q     So would you agree with me that if someone does not

 7    have anything to run from, for example the threat of a long

 8    prison sentence, it becomes less likely that they will run?

 9    Would you agree with that statement?

10         A     I do not agree with that.

11         Q     So if you're running from a bear in the woods, and

12    the bear disappears, are you going to keep running?

13               THE COURT:  All right, Mr. Akers, let's ask questions

14    that relate to this detention hearing and the determination

15    that the Court -- there are no bears here.

16               MR. COMBS:  Understood.

17               THE COURT:  All right.

18    BY MR. AKERS:

19         Q     So let's talk about the sophisticated means.

20         A     Yes, sir.

21         Q     There were sophisticated means in the case, right?

22         A     That's correct.

23         Q     There were gangs in the case, right?

24         A     That's correct.

25         Q     There were -- there was obstruction of justice in the

1    case, right?

2        A    That's correct.

3        Q    There were people that go back and forth to Nigeria I

4    think monthly, right, in the case?

5        A    Correct.

6        Q    But we're not here about the case in general, right?

7    We're here about Segun Adeoye, correct, for this proceeding?

8        A    Well, we're here about this investigation for this

9    proceeding, yes, we but we're here about the investigation that

10   he's a part of, yes, sir.

11       Q    Understood.  So he received $43,000, right?

12       A    Yes.

13       Q    $43,052, right?

14       A    Yes.

15       Q    And then, he wired that exact amount out minus the

16   $52, correct?

17       A    Yes.

18       Q    That's conduct right there that's not sophisticated

19   conduct.  Do you agree with me, right?

20       A    No.

21       Q    Okay, let's talk about the vulnerable victim of K.H.

22   We already talked about that nowhere in writing is Segun Adeoye

23   informed anywhere who that is?

24       A    That's correct.

25       Q    Or that she even exists?

1          A     That's correct.

2          Q     And how about I'll just ask the question.  Have you

3     spoken with anyone in this case?  Have you spoken with Edgal

4     Iribhogbe about whether or not he told the Segun Adeoye about

5     where that money came from?

6          A     There has been no conversation with Edgal.

7          Q     So what is contained in the -- what is contained in

8     writing, that's the evidence you have about what Segun Adeoye

9     knew where this money came from, correct?

10         A     What writing?  Are you talking about the letter that

11    Edgal sent after the fact?  Is that what you're --

12         Q     The letters, the texts, bank records, anything?

13         A     Well, I can't speculate as to what all was said

14    between them in person.

15         Q     Right.

16         A     But it's clear that they had conversations from the

17    chats prior to the chats happening.  So I don't know what

18    happened there.

19         Q     But that's the point.  You don't know what was in

20    them?

21         A     There was an agreement.

22         Q     But you don't -- it was a very specific question, you

23    do not know what was in those conversations, correct?

24         A     No, I was not a part of it, yes, you're right.

25         Q     You do not know what Edgal Iribhogbe told this

1    Defendant about where the money came from?

2        A    I was not a part of those conversations.

3        Q    You do not know if in fact he told Segun Adeoye that

4    this was illegal money?

5        A    I was not a part of that conversation.

6        Q    So is that a no, I don't know?

7        A    I don't know.

8        Q    Okay, let's talk about theft from a person of

9    another.  Did Segun Adeoye have physical contact with any

10   victim?

11       A    This investigation isn't a physical contact

12   investigation.

13       Q    Right, it's a note, right?

14       A    It's still stealing from victims.

15       Q    I understand.

16       A    Yeah.

17       Q    But he's never touched or stolen anything from a

18   person, right?

19       A    Not that I know of, no, sir.

20       Q    Okay, and you know that that's what that enhancement

21   is for, right?

22       A    That's what you're saying, yes, sir.

23       Q    Are you familiar with United States v. Ledondo

24   (phonetic)?

25       A    No.

1    Q    Okay.  And finally, about either a large number of

2    vulnerable victims or the fact of one vulnerable victim, again,

3    and I'm beating a dead horse here, or maybe a dead bear, you do

4    not know what was told to Segun Adeoye about where this money

5    came from, who it came from, or the status of any of these

6    victims, correct?

7    A    That's correct.

8    Q    Let's talk about those -- that intended loss that we

9    brought up earlier.  The $80,000, that's from one text message?

10   That's where you get that information, correct?

11   A    Yes.

12   Q    And it's from Edgal sending a message to Dr. Adeoye

13   saying I don't need -- essentially I'm paraphrasing, I don't

14   need any help with $80,000, but I'm going to send you

15   something -- I'm going to send you 43-.  Is that correct?

16   A    That's correct.

17   Q    Is that the sum total of evidence you have about an

18   $80,000 transaction as it relates to Segun Adeoye?

19   A    I don't know right off because there were other chats

20   going on during that time.  I can't answer that.

21   Q    Okay, but --

22   A    I don't remember, so I can't answer that.

23   Q    Well, as far -- and as far as what you remember and

24   are here to testify about, you can't tell us that there was

25   more, correct?

1       A     There was a conversation about the 80,000.

2  Apparently, they had met right prior to that because the chance

3  that we --

4            THE COURT:  So when you say they --

5            THE WITNESS:  I'm sorry.

6            THE COURT:  -- can you specify who they is?

7            THE WITNESS:  Sorry.  So Edgal and Mr. Adeoye had

8  obviously met or had some kind of communication prior to those

9  chats being sent, because the chats pick up in the middle of a

10 conversation.

11           It's not, hey, you know, this, this, and this.  It

12 is -- it references -- starts off referencing the 80,000.  And

13 then, there are three pictures sent of the money that he sent

14 through other co-conspirators that are sent to Mr. Segun (sic).

15 BY MR. AKERS:

16      Q     Are you talking about the cashier's checks that add

17 up to 43-?

18      A     No, sir.

19      Q     You --

20      A     There are additionally three pictures --

21      Q     Sure.

22      A     -- in WhatsApp that were sent to Mr. Adeoye by Edgal

23 with other co-conspirators that were -- I don't know the exact

24 amounts, but they are large dollar amounts that were sent to

25 him prior to him sending the 43,000.

1     Q     Right.

2     A     So there was a conversation that I was not a part of

3  that we do not have in writing that must have had them.

4     Q     And just so I'm clear, you don't have it in writing

5  and you don't have any information about it in the entirety of

6  your investigation?  No one has told you what that conversation

7  consisted of?

8     A     No.

9     Q     You have no evidence to support whatever happened in

10  that conversation, correct?

11     A     Not in that conversation.

12     Q     And then, finally, this 51,000 of checks that we

13  wanted to add in to to make this 175- number, those were checks

14  that pictures were sent to Segun Adeoye, correct?

15     A     Yes.

16     Q     No money ever made it into his account?

17     A     The money was moved out of Edgal's account and then

18  apparently something happened before it went into his account.

19     Q     Where did it go?

20     A     I'm not sure.

21     Q     It did not go to Segun Adeoye, we can be clear about

22  that, right?

23     A     I'm not aware that it went to him.

24     Q     Okay.

25     A     It was intended to go to him, but I don't know what

1    happened.

2        Q    Based on what conversation?

3        A    Based on him sending -- so the process that happened

4    with the 43,000, it was the same process that was going to

5    happen with the rest.  For whatever reason whether it was a

6    conversation that I don't have, it didn't happen.

7        Q    Have you called the banks to verify if those checks

8    were real?

9        A    I have not.

10       Q    We made a big deal about the phone tolls between

11   Edgal Iribhogbe and Segun Adeoye, correct?

12       A    Uh-huh.  Yes, I'm sorry.  Yes, sir.

13       Q    And the time of the original detention hearing, you

14   just had the toll report, I believe, correct?

15       A    That's correct.

16       Q    You now have -- you downloaded from Edgal's phone the

17   actual messages, right?

18       A    Yes.

19       Q    Out of the 50 between May and July, I think is that

20   the correct number?

21       A    Yes, the time frame, yes.

22       Q    A vast majority of those are missed calls?

23       A    Yes.  And they're talking over an encrypted app.

24   They're making voice calls over an encrypted app.  Speaks to

25   the sophistication of this.  They use WhatsApp because it's

```
 1    encrypted.  They send -- they as far as co-conspirators,

 2    co-defendants in this investigation, they use WhatsApp for

 3    this.

 4        Q    Do you have an international calling plan on your

 5    phone?

 6        A    I sure don't.

 7        Q    I don't either.  Do you know that it's cheaper to

 8    call overseas to Africa, Europe, places like that with an app

 9    like WhatsApp because it's -- it uses data or the Internet

10    rather than cellular data?

11        A    Sure.

12        Q    You know as part of your investigation of multiple

13    schemes that lots of people do that to talk overseas whether or

14    not they are trying to encrypt data?

15        A    Yes.

16        Q    In fact, Dr. Adeoye --

17             THE COURT:  Mr. Akers, before you move on, I don't

18    think the witness answered your initial question, which I think

19    is relevant to the Court's determination.  There were 50 calls

20    or 50 contacts and Mr. Akers' question to you was is it correct

21    that many of those were missed calls?  And I think he asked for

22    the number.  Are you aware of the number that are missed calls?

23             THE WITNESS:  No, ma'am, but there are missed calls

24    between the two back and forth.

25             THE COURT:  Are you aware, are you able to ballpark,
```

1    is it more than 50 percent of those 50 contacts that are missed

2    calls, less than 50 percent?

3              THE WITNESS:  I'd be guessing, ma'am.  I don't know.

4              THE COURT:  How would you --

5              THE WITNESS:  But there's -- there are several missed

6    calls, yes, ma'am.

7              THE COURT:  How would you go about determining how

8    many missed calls versus not missed calls?

9              THE WITNESS:  I can go look at that report and pull

10   those off and get the exact number.

11             THE COURT:  All right, thank you.  Mr. Akers, you can

12   proceed.

13   BY MR. AKERS:

14        Q    I think is it a majority that are missed calls and or

15   missed texts that are not responded to?

16        A    Again, Mr. Akers, I do not want to misspeak.

17        Q    Okay, but we can agree that it's a lot.

18        A    There are some.

19        Q    And when Mr. Iribhogbe deposits that money into

20   Segun's account, the $43,000 and $43,052, that is on I think

21   it's May 15th; is that correct?

22        A    I'd have to look at the date, but that sounds right.

23        Q    The money is wired in -- on May 27th, does that sound

24   correct?

25        A    Yes.

1    Q    In that time period, there are a lot of messages from

2  Edgal saying when are you going to send the money, right?

3    A    Yes, sir, that's right.

4    Q    Not a lot of responses, right?

5    A    Yes, sir.

6    Q    Just lots of texts and calls saying, I mean,

7  paraphrasing, what's the deal, right?

8    A    Yes.

9    Q    And you have -- you've investigated Dr. Adeoye's

10  background, right?

11    A    As far as being a doctor?

12    Q    Right.

13    A    Yeah.

14    Q    And he's a travelling emergency room physician?

15    A    That's correct.

16    Q    Probably a busy job I would imagine?

17    A    Yes.

18    Q    And as far as that $52,000 or $51,000, those extra

19  checks, does Dr. Adeoye ever respond about that?

20    A    I don't recall that.

21    Q    So I believe the -- and I'm going to summarize here

22  and if there's more, please tell me.  I believe the reason that

23  you all believe that Dr. Adeoye is a flight risk is because

24  he's facing a prison sentence, right?  That's one.

25    A    Yes.

1    Q    He has contact with family members in Nigeria and has

2    family in Nigeria, correct?

3    A    Yes.

4    Q    Agent Richardson, who's testimony you've adopted,

5    said because he has contacts in Japan, other than just sending

6    that money to Kayakuyo (phonetic) Limited, do you know of him

7    having any contacts in Japan?

8    A    I don't know his contacts, all of them, sir.

9    Q    And in the course of your investigation, is it your

10   belief that Dr. Adeoye has any contacts in Japan?

11   A    I don't know his contacts, sir.

12   Q    And the -- he has -- at least had 18 months ago

13   substantial assets with which to flee?

14   A    Yes.

15   Q    Is there anything else?

16   A    So there is a portion of this investigation that we

17   don't know as far as the foreign assets.  We don't get the

18   luxury of seeing those bank accounts of knowing that those

19   transactions that this is how this scheme works, having foreign

20   bank accounts, having foreign assets.  I don't have those.  So

21   I don't know that those exist, but we've seen that across the

22   board with each and every Defendant.

23   Q    So just so I'm clear, is it those three things that

24   I -- those four things that I mentioned that you have evidence

25   of, is that the total of it?

1    A    Based on the investigation, yes.

2    Q    Okay.  So we already talked about the loss amounts

3    and whether or not he's -- and that determination's obviously

4    for the Court, right?  We -- whether or not he's facing a long

5    prison sentence?

6    A    It's up to the Court, yes, sir.

7    Q    Yeah.  You -- and with that plea agreement that was

8    sent, would you think that he could plead guilty tomorrow and

9    get out of jail right after sentencing?

10    A    I don't get to dictate a sentencing, but he could

11    plead guilty tomorrow.

12    Q    Would -- based on your experience in the federal

13    criminal justice system and what you know of this case and the

14    loss amounts, would you think that he would be released

15    sometime, sir?

16    A    Again, sir, I don't get to dictate what the judge

17    does, but that's possible.

18    Q    He has no criminal record, correct?

19    A    That's correct.

20    Q    A lot of his assets have been seized, right?

21    A    Yes.

22    Q    Do you know that he is not been to Nigeria since

23    2013?

24    A    That's correct.

25    Q    When he was arrested, did you all make any attempt to

 1   contact him beforehand?

 2        A    No, because of -- the way the investigation is, there

 3   was not an attempt.  It was a widespread arrest with multiple

 4   individuals and that's the way we do that.

 5        Q    When he was arrested, any indication that he

 6   attempted to flee?

 7        A    No.

 8        Q    Any fighting, struggling, anything like that?

 9        A    No, sir.

10        Q    Completely respectful, as long as -- as far as you're

11   aware?

12        A    As far as I know, yes, sir.

13        Q    When he was arrested, he was in the midst of doing an

14   emergency room shift in a small town in Texas?

15        A    Yes.

16        Q    Yes, in Kermit, Texas.

17        A    You have no information to suggest he plans to flee

18   the country, correct?

19        A    No.

20        Q    No information to suggest he plans to obstruct

21   justice, correct?

22        A    This is an ongoing investigation.  I can't answer

23   that.

24        Q    No information to suggest that he himself is a danger

25   and should be released?

```
 1        A    No.

 2             MR. AKERS:  If the Court could give me just a moment?

 3        (Pause)

 4   BY MR. AKERS:

 5        Q    Would you feel comfortable looking at the document

 6   and letting the Court know after testimony how much of those

 7   calls or tolls between Edgal and Segun Adeoye were either

 8   missed calls or texts from Edgal that were not responded to?

 9        A    Yes.

10             MR. AKERS:  Pass the witness.

11             THE COURT:  All right.  I have a few questions and

12   then, Mr. Combs, if you have anything at all -- else for your

13   witness.

14             I think Mr. Akers already covered my first point.  I

15   am going to ask for you to supplement your testimony within 14

16   days of today's date to advise the Court of the number of those

17   50 contacts, because that's one of the things Judge Mazzant

18   relied on in revoking my original decision.  How many of those

19   were missed calls and what the substance of the remaining

20   communications are where there were no missed calls, where they

21   actually were in contact with each other to the extent you're

22   able to?

23             THE DEFENDANT:  Yes, ma'am.  Do you want me to

24   provide a copy of it and in a written notebook?

25             THE COURT:  I'll let you work with the Government as
```

1    to how you all choose to summarize that.  I'm not going to

2    require any particular form.  I'm just asking for the

3    information to be supplemented.

4              THE DEFENDANT:  Yes, ma'am.  We'll make it happen.

5              THE COURT:  As well, one of the other factors that

6    Judge Mazzant relied on was the family in Nigeria that was

7    referenced here today.  Certainly, I am very well understanding

8    that the Court makes the ultimate decision regarding

9    sentencing, but as it relates to family, I believe the initial

10   testimony was that his parents and two siblings still lived in

11   Nigeria.

12             Are you aware, is that still remain the case?  Does

13   he have parents and two siblings still in Nigeria or has that

14   family changed?

15             THE WITNESS:  I don't know that that's changed,

16   ma'am.  I don't know.

17             THE COURT:  Okay, one of the other things was the

18   money as to whether or not there were assets to flee.  Have you

19   done any additional research or have you obtained any

20   additional information as to whether or not the value or the

21   amount of any assets has changed?

22             THE WITNESS:  Not to my knowledge, ma'am.

23             THE COURT:  And so, are you saying to my knowledge I

24   haven't done any additional research or to my knowledge there

25   has been no change?

1       THE WITNESS:  To my knowledge, there's been no

2   change.

3       THE COURT:  All right, in light of the questions that

4   I've asked, Mr. Combs, do you have any additional questions for

5   your witness?

6       MR. COMBS:  Yes, Your Honor, just a few.

7       THE COURT:  Certainly.

8                       **REDIRECT EXAMINATION**

9   BY MR. COMBS:

10      Q    Sir, now and this goes to the responsibility for

11  reasonably foreseeable actions of other co-conspirators.  You

12  testified on cross-examination that there were a number of

13  photographs of money that was sent to other co-conspirators

14  that were sent -- the photographs themselves were sent to this

15  Defendant; is that right?

16      A    Yes.

17      Q    And so based on that, do you believe that it was

18  reasonably foreseeable to him that there were other

19  co-conspirators?

20      A    Yes.

21      Q    You said that the text string picks up in midstream.

22  And when you're talking about the text string, you said Edgal

23  and the Defendant.  Who is Edgal?

24      A    Edgal Iribhogbe is a co-defendant in this case

25  married to Sandra Iribhogbe.  That we had a Title 3 on his wife

 1    and he -- is a large part of this investigation who is -- who's

 2    known Segun for many, many years.  They knew each other in

 3    Nigeria.

 4        Q    Okay.  And that -- so Edgal Iribhogbe is Defendant

 5    number 7 in this case.  Is that right?

 6        A    Yes.

 7        Q    And the person you've referred to is Sandra, in your

 8    cross-examination just now, Sandra Iribhogbe is Sandra

 9    Iribhogbe Popnen, who's Defendant number 6 in this case; is

10    that right?

11        A    Yes.

12        Q    Now you said that they go back to Nigeria.  Who goes

13    back to Nigeria?

14        A    Edgal and Segun had known each other in Nigeria prior

15    to coming to the United States.

16        Q    Okay, so their contact began in a foreign country?

17        A    Yes.

18        Q    The text string that picks up in midstream, does that

19    lead you to believe that there were other devices, other

20    accounts that you never seized?  Do you believe that?

21        A    Yes, I believe that there's other conversations that

22    we just weren't privy to.

23        Q    Okay, whether those were in person or in -- on a

24    different app or on a different phone?

25        A    That's correct.

```
 1        Q    You just weren't privy to them?

 2        A    That's correct.

 3        Q    Something was happening before what you saw?

 4        A    That's correct.

 5        Q    Okay.  No further questions.

 6             MR. COMBS:  Pass the witness.

 7             THE COURT:  Mr. Akers, sir, any questions for this

 8   witness?

 9             MR. AKERS:  No, Your Honor.

10             THE COURT:  Sir, thank you so much.  You may step

11   down.

12             THE WITNESS:  Thank you, ma'am.  Appreciate it.

13        (Witness is excused)

14             THE COURT:  Does the Government have any further

15   witnesses to present to the Court or evidence to proffer to the

16   Court at this time?

17             MR. COMBS:  No, Your Honor, no.

18             THE COURT:  All right, Mr. Akers, you may proceed to

19   call your first witness.

20             MR. AKERS:  We call Gertrude Florent, Your Honor.

21             THE COURT:  I'm sorry, who?

22             MR. AKERS:  Gertrude Florent.

23             THE COURT:  All right, Ms. Florent, if you can please

24   come forward.

25
```

1                        GERTRUDE FLORENT

2    called as a witness for the Defendant, having been duly sworn

3                        testified as follows:

4              THE COURT:  Ma'am, once you're seated, I'm going to

5    ask for you to please state your full name into that microphone

6    and then spell it for me as well.

7              THE WITNESS:  Will you please say that again?

8              THE COURT:  I need you to tell me your full name and

9    then spell it.

10             THE WITNESS:  My name is Gertrude Florent, G-E-R-T-R-

11   U-D-E F-L-O-R-E-N-T as in Tom.

12             THE COURT:  Thank you.

13             You may proceed.

14             MR. AKERS:  Thank you, Your Honor.

15                      **DIRECT EXAMINATION**

16   BY MR. AKERS:

17       Q    Gertrude, or as I've come to know you, Ms. Gertrude,

18   tell us how you met Dr. Segun Adeoye?

19       A    I'm an employee at Texas Southern University, where

20   Segun Adeoye was a student.  And upon his arrival, I had good

21   connection of the international student department where the

22   director connected me with him because I was a source and

23   instrumental in helping the international student get

24   acclimated.  I was like their mom away from home.

25       Q    Did you continue that relationship?

```
 1         A    Up until this day.

 2         Q    Well, it's not going to stop today, is it?

 3         A    No.

 4         Q    Tell us before -- I skipped this, tell us little bit

 5    about you, your background and your employment at Texas

 6    Southern University in Houston?

 7         A    I am from the Caribbean island of Dominica.  So I do

 8    know and I came up to go to school at Texas Southern University

 9    as well.

10         I do know what -- how the international student have to

11    face when they come here without support from within the

12    campus.  So I became that source of support to those students.

13         And when I was -- the international student director asked

14    me to connect me with him, we -- I was support to him getting

15    him acclimated in the -- within the system here.

16         Q    And when did you come over here?

17         A    When did I come up?

18         Q    Yes, ma'am.

19         A    It was about 40 years ago.

20         Q    You say 40 or 14?

21         A    4-0 years ago.

22         Q    So a little bit before I was born?

23         A    Yeah.

24         Q    And after your contact with Segun Adeoye, the

25    student, did you come to know Segun Adeoye, the doctor?
```

1      A      Yes.

2      Q      The Government had made a big deal about him sending

3  money home to Nigeria.  Is that the only place he is generous

4  with the money he makes from his doctor business?

5      A      Say the question again?  I didn't hear you.

6      Q      The Government has made a big deal about him sending

7  money to his family in Nigeria from 2014 to 2016.

8      A      Uh-huh.

9      Q      Do you in fact know that he was also generous with

10  people here?

11      A      Yes.

12      Q      How so?

13      A      I was one.

14      Q      How?

15      A      He helped me when my mom died.  We were connected,

16  he's like a son to us.  We accepted him as our home -- in our

17  home as a son.  He was taking care of my mom.

18      And when she died -- she was diagnosed with cancer and was

19  supposed be life flighted to Dominica, he was the one who

20  called -- first person to call me, what are we doing about mom?

21  How are we sending her home?  She wants to go back home.  I

22  said I don't have any money.  He says, okay, put me down for so

23  much.

24      Q      And as long as you have known him, would you describe

25  him as a trustworthy person?

 1      A     Yes.

 2      Q     Would you describe him as someone that is sometimes

 3   too trustworthy?

 4      A     Too trustworthy.

 5      Q     Trusting, excuse me.

 6      A     Yes.  Yes.

 7      Q     We've talked, you and I, quite a bit over the course

 8   of this, right?

 9      A     Yeah.

10      Q     And have you essentially tried to manage his

11   financial affairs as best you can --

12      A     Yes.

13      Q     -- while he's in custody?

14      A     Yes, even before while he was doing his residency in

15   New York, I was in Houston, and his first home that he

16   purchased, I did the transaction here.  He did not even see the

17   house.  I purchased it for him.  This is how close he was.  He

18   trusted me that much.

19      Q     You and I have also talked about the possibility of

20   being what's called a third-party custodian; is that right?

21      A     Say that again?

22      Q     You and I have talked about what the possibility of

23   being something called a third-party custodian for --

24      A     Yes.

25      Q     -- Segun.  And are you familiar with those

1    requirements?

2         A    Yes, I do.

3         Q    Do you know that you would be required to make sure

4    he shows up to Court when he's supposed to?

5         A    Yes, I will.

6         Q    You would be required to make sure that he obeys

7    every single condition of bond that this judge imposes?

8         A    I will.

9         Q    He might be required to live with you?  Do you

10   understand that?

11        A    He's welcome, yes.

12        Q    And you are in fact willing to serve as that

13   third-party custodian?

14        A    Yes, I am.

15        Q    And were you in fact today interviewed by the United

16   States Pre-Trial Services Department?

17        A    Yes.

18        Q    And are you aware that they stated that you are a

19   suitable third-party custodian for this case?

20             THE COURT:  Ma'am, if you can just remember, speak a

21   little bit more loudly.  This has to be able to pick you up.

22   So I didn't quite catch the last answer to your question -- to

23   the question.  What was it?  What was your answer to the last

24   question?

25             THE WITNESS:  Yes.

```
 1              THE COURT:  Okay, thank you.
 2   BY MR. AKERS:
 3       Q    Based on what you know of your years of experience
 4   with Dr. Adeoye here, would he in fact do everything the Court
 5   requires as far as you know and are concerned?
 6       A    I believe Dr. Adeoye is a very ethical person and
 7   very honest.  He will do whatever he's asked to do.
 8       Q    Because he knows that if he doesn't, he puts on that
 9   striped jumpsuit again, right?
10       A    May, uh-huh.
11              MR. COMBS:  I pass the witness.
12              THE COURT:  Mr. Combs, sir?
13              MR. COMBS:  Yes, Your Honor.  May I proceed?
14              THE COURT:  You may.
15              MR. COMBS:  Thank you.
16                        CROSS-EXAMINATION
17   BY MR. COMBS:
18       Q    Ma'am, do you know Sandra Iribhogbe?
19       A    No, I don't.
20       Q    Do you know a Edgal Iribhogbe?
21       A    No, I don't.
22       Q    Do you -- if you were to wire $43,000 to somebody,
23   that'd be a pretty good deal to you; is that right?
24       A    If I were to wire $43,000, what?
25       Q    To somebody, that would be a big deal to you; is that
```

```
 1     right?  Be a big deal to most people, wouldn't it?

 2          A    Yeah, for most people, uh-huh.

 3          Q    Okay.  And do you know why Mr. Adeoye wired money to

 4     Edgal Iribhogbe --

 5          A    No.

 6          Q    -- or on his behalf?

 7          A    No, I don't know anything about that.

 8          Q    Do you know why Mr. Edgal Iribhogbe would discuss

 9     wiring money with him?

10          A    No, sir.

11          Q    Do -- is the Defendant in or Mr. Adeoye, is he in the

12     import export business?

13          A    Not that I know of.

14          Q    Not that you're -- you know him pretty well, right?

15          A    Very well.

16          Q    Have you ever known him to buy fish directly from a

17     importer in Japan?

18          A    Not that I know of, no.

19          Q    Would -- do you --

20          A    No recollection.

21          Q    Do you know any reason based on what you know of him

22     why he'd be wiring $43,000 to a fish importer in Japan?

23          A    No.

24          Q    You know he -- that would be a lot of fish, is that

25     fair?
```

```
 1         A    A lot of fish?  I don't know anything about --

 2         Q    You don't know anything?

 3         A    -- that transaction, no.

 4         Q    So there's aspects of his business life that you're

 5   just not aware of; is that fair?

 6         A    Don't know anything about that.

 7         Q    Thank you.

 8         A    Thank you.

 9              MR. COMBS:  Pass the witness.

10              THE COURT:  Mr. Akers, anything further for your

11   witness?

12              MR. AKERS:  No, Your Honor.

13              THE COURT:  All right, ma'am, do you know anything

14   about Mr. Adeoye's family in Nigeria?

15              THE WITNESS:  Yes, I do.  I met his mom and dad.

16   They were here.  I was instrumental in helping him getting his

17   mom prosthesis with doctor's visit and all that.  They

18   entrusted Adeoye in my hands pretty much.

19              THE COURT:  And so, are you aware what family members

20   he still has in Nigeria?

21              THE WITNESS:  If I'm aware?

22              THE COURT:  What family does he still have in

23   Nigeria?

24              THE WITNESS:  Yes, I do know, so.

25              THE COURT:  Can you tell me?
```

1          THE WITNESS:  He has his mom.  He has a brother.  And

2     he has a sister that I know of.

3          THE COURT:  And what about his father?

4          THE WITNESS:  His father recently passed away.

5          THE COURT:  All right, thank you.  In light of the

6     fact that I asked those questions, does the Government have any

7     further questions for this witness?

8          MR. COMBS:  I don't, thank you, Your Honor.

9          THE COURT:  And Mr. Akers?

10          MR. AKERS:  No, Your Honor.

11          THE COURT:  All right, thank you, ma'am.  You may

12     step down.

13          THE WITNESS:  Thank you.

14        (Witness is excused)

15          THE COURT:  Mr. Akers, do you have any further

16     witnesses to present or evidence to proffer to the Court at

17     this time, sir?

18          MR. AKERS:  I have --

19          THE COURT:  Mr. Akers, you're not at the microphone.

20          MR. AKERS:  No, Your Honor.  I would of course call

21     the Court's attention to because I didn't go --

22          THE COURT:  We're not having argument yet.  Is that

23     all the evidence you've got?

24          MR. AKERS:  Yes.

25          THE COURT:  All right.  Counsel, can you all

1    approach?  Yes, please leave it on.

2          (Bench conference, off the record, not transcribed)

3          THE COURT:  All right, everyone, we are back on the

4    record at this time in 421-CR-253, the United States of America

5    v. Segun Adeoye.

6          The Court's going to note for purposes of the record

7    it has requested that the Government file a supplement to its

8    witness' testimony here today.

9          I'm actually go allow to 21 days to file that

10   supplement to allow the witness to fully review each of those

11   50 contacts, the 50 contacts.  And should be -- the Court

12   should be advised how many of those contacts were missed calls

13   and to the extent able to summarize the substance of all

14   remaining contacts because that was one of the items that Judge

15   Mazzant considered in revoking my original order of release.

16         As well, we have established that there was a change

17   in family ties.  Originally, Mr. Adeoye had two parents and two

18   siblings.  One of his parents has passed away and as a result

19   he has three existing contacts in Nigeria.

20         There's a remaining question regarding financial

21   resources, so I'm just going to read the following text from

22   3142(g)(4) to everyone.

23         One of the factors that the Court is to consider is

24   the nature and seriousness of the danger to any person or the

25   community that would be posed by that person's release.

1          In considering conditions of release that are

2     described in subsection of (c)(1)(B)(x)(i) or (c)(1)(B)(x)(2)

3     of this section, and I'll go ahead and just refer those to you.

4          Those conditions are whether or not a bail bond with

5     solvent sureties can be executed or an execution of an

6     agreement to forfeit in such amount as is reasonably necessary

7     to assure the appearance of the person as required and shall

8     provide the Court with information regarding the values of

9     assets and liabilities of the surety if other than approved

10     surety, the nature and extent of encumbrances against the

11     surety's property, and then, as well, (x)(i), let's see, that's

12     executing agreement to forfeit upon failure to appear.

13          So, again, those are two conditions of release that

14     the Court can consider and the factors direct in connection

15     with that that the Court upon its own motion or shall upon

16     motion of the Government conduct an inquiry into the source of

17     property to be designated for potential forfeiture or offered

18     as collateral to secure a bond and shall decline to accept such

19     designation or the use of collateral of property because of its

20     source will not reasonably assure the person as required.

21          One of the factors that that court must consider is

22     whether or not it can require a bond that will assure Mr.

23     Adeoye's appearance here in Court.

24          None of the witnesses have been able to offer to the

25     Court here today whether or not the assets that were considered

1    by the Court in the initial detention hearing have changed such

2    that we either can place a bond that will assure his appearance

3    and/or whether or not they have so changed that he does not any

4    longer have substantial cash assets upon which he could flee.

5           And as a result, I am going to direct the parties to

6    meet and confer regarding that particular factor and to file a

7    report, joint report, with the Court within 21 days considering

8    specifically each of those items that are delineated in

9    3142(g)(4), so that the Court may ascertain and determine how

10   that particular factor weighs on the issue of detention.

11          As a result, we are not going to proceed to argument

12   at this time.  The Court is going to continue the remainder of

13   the detention hearing.  There will be no further evidence

14   presented to the Court beyond those pieces that we have

15   dictated into the record here today, but I will hear argument

16   from the parties on May the 30th at 10:15 a.m.

17          That is the date after the Court has set the deadline

18   to receive each of these additional pieces of information.  I'm

19   going to go ahead and just ask, Mr. Combs, do you have any

20   questions or is there anything that you believe that the Court

21   has omitted to state into the record?

22          MR. COMBS:  No, Your Honor.

23          THE COURT:  All right, Mr. Akers, what about you,

24   sir?

25          MR. AKERS:  No, Your Honor.

1          THE COURT:  All right, then everyone understanding

2     that the Court is continuing the remainder of the hearing for

3     purposes of argument to May the 30th, Court will be adjourned.

4          Mr. Adeoye, I want to make sure you understand, I've

5     asked for additional information to be provided to the Court.

6     So we're not proceeding to argument on how this issue should be

7     determined.  I'll see you back here on May the 30th.  And the

8     Court will make a decision at that time.  Do you understand?

9          THE DEFENDANT:  Yes.

10          THE COURT:  All right, everyone, thank you.  We will

11     be adjourned.  Thank you.

12        (Proceedings concluded at 2:10 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **CERTIFICATE**

2

3

4           I, Chris Hwang, court approved transcriber, certify

5    that the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the above-

7    entitled matter.

8

9

10

11

12

13    _____          June 3, 2023

14    Chris Hwang                Date

15    Court Reporter

16

17

18

19

20

21

22

23

24

25