1                     UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF TEXAS
2                         SHERMAN DIVISION

3     UNITED STATES OF AMERICA        | DOCKET 4:21-CR-253
                                      |
4     VS.                             |
                                      | FEBRUARY 29, 2024
5     EDGAL IRIBHOGBE, SEGUN ADEOYE,  |
      CHIDINDU OKEKE, AND CHIAGOZIEM  |
6     KIZITO OKEKE                    | SHERMAN, TEXAS

7     ---------------------------------------------------------

8              VOLUME 1 OF 1, PAGES 1 THROUGH 61

9          REPORTER'S TRANSCRIPT OF JURY TRIAL EXCERPT
                      TESTIMONY OF ISAAC ASARE
10
             BEFORE THE HONORABLE AMOS L. MAZZANT, III,
11            UNITED STATES DISTRICT JUDGE, AND A JURY

12    ---------------------------------------------------------

13

14    APPEARANCES:

15    FOR THE GOVERNMENT:     HEATHER HARRIS RATTAN
                              ANAND VARADARAJAN
16                            U.S. ATTORNEY'S OFFICE - PLANO
                              101 E. PARK BOULEVARD, SUITE 500
17                            PLANO, TX 75074

18

19    COURT REPORTER:        CHRISTINA L. BICKHAM, CRR, RDR
                             FEDERAL OFFICIAL REPORTER
20                           101 EAST PECAN
                             SHERMAN, TX 75090
21

22

23

24       PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
        TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
25

```
 1   FOR THE DEFENDANT EDGAL IRIBHOGBE:

 2                        PHILLIP A. LINDER
                         MATTHEW HAAS
 3                        BARRETT BRIGHT LASSITER LINDER PEREZ
                         3300 OAK LAWN AVENUE, SUITE 700
 4                        DALLAS, TX 75219

 5

 6
     FOR THE DEFENDANT SEGUN ADEOYE:
 7
                         JOHN HUNTER SMITH
 8                        WYNNE, SMITH & YOUNG, PLLC
                         707 WEST WASHINGTON
 9                        SHERMAN, TX 75092

10

11
     FOR THE DEFENDANT CHIDINDU OKEKE:
12
                         RAFAEL DE LA GARZA, II
13                        THE DE LA GARZA LAW FIRM
                         3941 LEGACY DRIVE, SUITE 204-A192
14                        PLANO, TX 75023

15

16
     FOR THE DEFENDANT CHIAGOZIEM KIZITO OKEKE:
17
                         JAMES P. WHALEN
18                        RYNE SANDEL
                         WHALEN LAW OFFICE
19                        9300 JOHN HICKMAN PARKWAY, SUITE 501
                         FRISCO, TX 75035
20

21

22

23

24

25
```

```
 1              (Open court, defendants present, jury present.)

 2              MS. RATTAN:  Your Honor, the United States calls

 3   Isaac Asare.

 4              THE COURT:  Sir, can you raise your -- you can

 5   stay seated, but raise your right hand to be sworn in.

 6              (The oath is administered to the witness.)

 7              THE COURT:  Go ahead and proceed.

 8              DIRECT EXAMINATION OF ISAAC ASARE

 9              CALLED ON BEHALF OF THE GOVERNMENT

10   BY MS. RATTAN:

11   Q.  Please state your name.

12   A.  Isaac Asare.

13              MS. RATTAN:  Your Honor, may I approach the

14   witness?

15              THE COURT:  Yes, you may.

16   BY MS. RATTAN:

17   Q.  Mr. Asare, I'm showing you what's been marked as

18   Government's Exhibit 278.  I'll ask you to look at that and

19   tell me whether you recognize it.

20   A.  Yeah.  That's my Plea Agreement.

21   Q.  And let's look at 278, page 11.  Do you recognize that

22   as your signature?

23   A.  Yes, ma'am.

24   Q.  And then your signature is also on 278, page 14; is

25   that right?
```

1    A.  Yes, ma'am.

2            MS. RATTAN:  Your Honor, we'll offer Government's

3    Exhibit 278.

4            MR. WHALEN:  No objection, your Honor.

5            MR. LINDER:  No objection.

6            MR. SMITH:  No objections.

7            MR. DE LA GARZA:  No objection, your Honor.

8            THE COURT:  Okay.  278 will be admitted.

9            MS. RATTAN:  And may I return to the podium?

10           THE COURT:  Yes, you may.

11   BY MS. RATTAN:

12   Q.  So, Mr. Asare, you're in the custody of the United

13   States Marshal; is that right?

14   A.  Yes, ma'am.

15   Q.  You're appearing here today, and you're in handcuffs

16   and chains; is that right?

17   A.  Yes, ma'am.

18   Q.  Have you entered a plea of guilty to federal charges?

19   A.  Yes, ma'am.

20   Q.  You pled guilty in this case; is that right?

21   A.  Yes, ma'am.

22   Q.  And Government's Exhibit 278 is the Plea Agreement that

23   you entered into with the United States when you pled

24   guilty?

25   A.  Yes, ma'am.

1   Q.  Did you plead guilty because you are guilty?

2   A.  Yes, ma'am.

3   Q.  And the crime that you pled guilty to was charged in

4   Count 1 of your Indictment, and it was conspiracy to commit

5   wire fraud; is that --

6   A.  Yes, ma'am.

7   Q.  Let me direct your attention to your Plea Agreement.

8           MS. RATTAN:  If we can publish Government's

9   Exhibit 278, page 1.

10  BY MS. RATTAN:

11  Q.  Mr. Asare, there to your right you can see your Plea

12  Agreement.  It's the *United States of America versus Isaac*

13  *Asare*, and you are Defendant Number 24 in this case; is

14  that right?

15  A.  Yes, ma'am.

16  Q.  And, Mr. Asare, you agreed to give up the rights that

17  you had in this case.  You had a right to plead not guilty,

18  to have a trial by jury, to have your guilt proved beyond a

19  reasonable doubt, to confront and cross-examine any

20  witnesses against you, to call witnesses on your behalf,

21  and to not testify or provide any information against

22  yourself.

23          In this Plea Agreement, did you agree to give up

24  those rights?

25  A.  Yes, ma'am.

1    Q.  And in paragraph 2 of the Plea Agreement, did you agree

2    to enter a plea of guilty and accept responsibility for the

3    crime you committed, and that is conspiracy to commit wire

4    fraud; is that right?

5    A.  Yes, ma'am.

6    Q.  And you did this because you're guilty.  Is that fair

7    to say?

8    A.  Yes, ma'am.

9    Q.  And on page 2 -- Government's Exhibit 278, page 2, it

10   talks about the punishment range in your case.  It's

11   imprisonment for not more than 20 years, a fine not to

12   exceed $250,000, supervised release -- that is, after

13   you're released, you'll be on supervision by the United

14   States Probation Office for not more than three years.

15   There is a special assessment, any forfeiture, possible

16   restitution.

17          And then in paragraph 4, it talks about the fact

18   that your sentence in this case will be decided by the

19   judge.  And the judge in your case --

20          MS. RATTAN:  If we can look at page 1 -- 278,

21   page 1.

22   BY MS. RATTAN:

23   Q.  -- is Judge Mazzant.  Is that your understanding?

24   A.  Yes, ma'am.

25   Q.  Now, on page 3 there is some specific information that

1  will be decided by Judge Mazzant.

2          The parties stipulate that the following factors

3  may affect the case.  The parties agree that we haven't

4  reached an agreement -- and so it will be decided by the

5  Court -- that the United States is going to argue that the

6  loss amount that's related to you is more than 3.5 million,

7  less than 9.5 million.  And, anyway, there are going to be

8  things at your sentencing related to the number of victims,

9  locating funds to foreign jurisdictions, whether the

10  victims were vulnerable by age or other life circumstance.

11          Do you understand that in your Plea Agreement,

12  you've agreed that Judge Mazzant is going to make those

13  decisions?  Is --

14  A.  Yes, ma'am.

15  Q.  -- that right?

16          MS. RATTAN:  Now let's look at 278, page 4.  We

17  can look at paragraph 6.

18  BY MS. RATTAN:

19  Q.  By entering your plea of guilty, you've accepted

20  responsibility for your role in the crime; is that right?

21  A.  Yes, ma'am.

22  Q.  But you agree and understand that accepting

23  responsibility and giving truthful and complete information

24  about your participation in the offense -- because of that,

25  you may be entitled to a reduction in your offense level,

 1   and you shouldn't violate any other law while you are

 2   involved in this case, and you have to submit information

 3   to the Probation Department.

 4          But you understand that you're required to accept

 5   responsibility and give complete and truthful information.

 6   Is that your understanding?

 7   A.  Yes, ma'am.

 8   Q.  And, in fact, before coming to court today, you've met

 9   with the agents and you've met with me on the case and

10   you've told us about what happened during the crime.

11          MR. DE LA GARZA:  Objection, your Honor, to

12   leading.

13          THE COURT:  Well, just rephrase your question.

14   BY MS. RATTAN:

15   Q.  Did you meet with the representatives of the Government

16   and tell us what happened?

17   A.  Yes, ma'am.

18   Q.  And then let's look at the final page of your Plea

19   Agreement.

20          MS. RATTAN:  That would be 278, page 11.

21   BY MS. RATTAN:

22   Q.  And that's your signature that you identified earlier;

23   is that right?

24   A.  Yes, ma'am.

25          MS. RATTAN:  And then if we look at 278, page 13,

1   this is called a Plea Agreement Addendum.  And if we can

2   look at the substantial assistance paragraph there.

3   BY MS. RATTAN:

4   Q.  Now, as part of your Plea Agreement, you agreed to

5   cooperate and provide information about what happened

6   during the crime; is that right?

7          MR. DE LA GARZA:  Objection, your Honor, as to

8   leading.

9          THE COURT:  Overruled.

10  BY MS. RATTAN:

11  Q.  And you understand, through your Plea Agreement and the

12  Plea Agreement Addendum, that you could receive a benefit.

13  Your judge could decide to lower your sentence based on

14  your cooperation; is that right?

15  A.  Yes, ma'am.

16  Q.  So your agreement is if, in its sole discretion, the

17  Government determines that the Defendant has provided

18  substantial assistance and otherwise complied with the

19  terms of the agreement, the Government may file a motion

20  for downward departure or a motion for reduction of

21  sentence.

22          Now, you need to understand that your cooperation

23  doesn't automatically require the Government to file a

24  departure, and the timing for such filing will be

25  determined by the Government.

1           Do you understand that?

2    A.  Yes, ma'am.

3    Q.  And, finally, this is your agreement, that it's

4    entirely within the Court's discretion as to what, if any,

5    reduction you would receive based on your cooperation, and

6    you know that that will be decided by Judge Mazzant.  Do

7    you understand that?

8    A.  Yes, ma'am.

9    Q.  Now, Mr. Asare, let's talk about your background.

10   Where were you born and raised?

11   A.  I was born in Ghana, raised in Ghana.  I came to United

12   States 2013.

13   Q.  And how was it that you were able to come to the United

14   States?

15   A.  I had a DV1, I believe, lottery after high school.

16   Q.  So there was a lottery?

17   A.  Yes, ma'am.

18   Q.  And you won the lottery?

19   A.  Yes, ma'am.

20   Q.  Explain to us what a lottery is.

21   A.  We have the -- before high school graduation, we kind

22   of had space in a lottery in high school to get a chance to

23   come to United States, continue your education over here.

24   So I took a part in that lottery, and then I won.  So

25   that's --

1   Q.  So you won the lottery, and you got to come to the U.S.

2       And you came in 2013?

3   A.  Yes, ma'am.

4   Q.  Once you got to the United States, where did you work?

5   A.  I had a job with Frito-Lay.

6   Q.  And what did you do at Frito-Lay?

7   A.  I started working in the warehouse, and then I got a

8   little promotion to start doing safety training over there.

9   Q.  At some point after you came to the United States, did

10  you meet someone who you knew to be Alex?

11  A.  Yes, ma'am.

12  Q.  Where did you meet Alex?

13  A.  I met Alex through my ex-girlfriend's sister.

14  Q.  And around when was it that you met Alex?

15  A.  I'm not really sure the exact date, but I believe

16  probably 2018, maybe '19, I believe.

17  Q.  And did you know whether Alex had a brother?

18  A.  Yes, ma'am.

19  Q.  And did you know what Alex's brother's name was?

20  A.  Yes, ma'am.

21  Q.  What was it?

22  A.  I knew him as Gerard.

23  Q.  So Alex and Gerard.

24      You first met Alex, and then how did you meet

25  Gerard?

 1  A.  I really met both of them same time, but I wasn't close

 2  to Gerard because Alex was dating my ex-sister at that

 3  time.  That's how I was really a little close to Alex.

 4  Q.  So your girlfriend and Alex's girlfriend were friends?

 5  A.  My ex at that time was Alex's -- my ex, at that time,

 6  sister was dating Alex at that time.

 7  Q.  Okay.  So they were sisters?

 8  A.  Yes, ma'am.

 9  Q.  Your girlfriend and Alex's girlfriend were sisters?

10  A.  Yes, ma'am.

11  Q.  So that's how you knew Alex?

12  A.  Yes, ma'am.

13  Q.  And then you knew Chidindu, Alex's brother, through

14  Alex?

15  A.  Yeah, kind of.  But I met -- I met them before.

16  Q.  You met who before?

17  A.  I met both brothers before.

18  Q.  Okay.  So then did you develop a relationship with

19  Alex?

20  A.  Yes, ma'am.

21  Q.  Can you describe?  Were you friends?

22  A.  I would say we were friends.

23  Q.  Okay.  At some point did Alex help you start a

24  business?

25  A.  I had a -- I had a plan that I wanted to start because

1    when I came to United States, I came over here to go to

2    school.  So when I came over here, I was over here by

3    myself.  My parents and my siblings all back home.  So I

4    was living with my dad friend at the time, so he took a job

5    in Beaumont.  So he left Houston, went to Beaumont.

6    Q.  Are you saying Beaumont?

7    A.  Yes, ma'am.

8    Q.  And that's about an hour east of Houston; is that

9    right?

10   A.  Yes, ma'am.

11         So I had to find me a place by myself, get a car,

12   then get a job.  So I had the job at Frito-Lay, so I was

13   working by myself and I was paying my rent by myself.

14         So I started school maybe three years after I had

15   the job.  So going to school, working, things was getting a

16   little tough, so I had a plan that I wanted to start a

17   business going to buying cars from auction and send it --

18   fix it, send it back home, and sell it.  So I already had a

19   plan in my mind so when I met Alex, we talked about it, and

20   then he helped me open business account.

21   Q.  Okay.  What was the name of your business?

22   A.  Asarko.

23   Q.  How do you spell that?

24   A.  A-S-A-R-K-O.

25         MS. RATTAN:  May I approach the witness, your

1    Honor?

2              THE COURT:  Yes.

3    BY MS. RATTAN:

4    Q.  Let me show you this chart, ask you to look at it.  Do

5    you see your picture on here where it says "Isaac Asare"?

6    And then what does it say?

7    A.  Asarko.

8    Q.  Okay.  Is that the name of your business?

9    A.  Yes, ma'am.

10   Q.  And that's your name?

11   A.  Yes, ma'am.

12   Q.  So you're Isaac Asare, and your business is Asarko?

13   A.  Yes, ma'am.

14   Q.  And did Alex help you get your business started, with

15   paperwork, business accounts, that sort of thing?

16   A.  He just kind of gave me idea how to open a business

17   account because I believe he already had a business before,

18   I believe.  So he just kind of enlightened me how to open a

19   business account.

20   Q.  And did you do it?

21   A.  Yes, ma'am.

22   Q.  And so your business account would be Isaac Asare

23   Asarko; is that right?

24   A.  Yes, ma'am.

25   Q.  At some point did Alex give you money to put into your

1    business account?

2    A.  So when I opened my account, like I said, I was trying

3    to find ways and means to take care of myself over here,

4    work and go to school, same time support my family back

5    home.  Things was kind of hard, so I talked to him about it

6    and then -- because I knew he had a business account -- he

7    had a business that he was doing, which is -- at the time I

8    think he had a trailer business.

9           So he -- I talked to him about what my struggle

10   was, and then he told me they had a business, that it was

11   booming so if I'm interested.  And then if I want to do it,

12   he'd kind of, like, help me out getting some money.

13   Q.  So he would help you get some money and put it in your

14   Asarko account?

15   A.  Well, like I said, he told me they had a business they

16   was doing so if I'm interested.

17          So I tell him I'm interested.

18          So what it was, like I said, I already had a

19   business.  I opened the business account, and then I had a

20   bank account connected to my business.  So they had a

21   business they was doing which is foreign exchange.  So he

22   gave me some money from -- I don't know where the money

23   came from -- put in the account and transfer the money.

24   Q.  Now, that was one time; is that right?

25          There was money that was put into your account,

1    and it came from Alex?

2    A.  Yes, ma'am.

3    Q.  Eventually was there more and more money that came from

4    the Okekes -- was their last name Okeke?

5    A.  Yes, ma'am.

6    Q.  And you knew them as Alex and Gerard?

7    A.  Yes, ma'am.

8    Q.  Eventually was there more and more money that came from

9    Alex and Gerard that you allowed to be placed into your

10   business account, Isaac Asare Asarko?

11   A.  Yes, ma'am.

12   Q.  And so were there, in fact, large amounts of money that

13   would be placed into your business account?

14   A.  I think probably the largest I took, probably maybe

15   50,000.

16   Q.  And how would the money be placed into your business

17   account?

18   A.  So I took physical cash, put it in my business account,

19   and transferred it.

20   Q.  And where would you get that physical cash?

21   A.  Sometimes I would meet them maybe outside my apartment.

22   Sometimes I would meet them probably maybe their home.

23   Q.  Who would tell you when they wanted to meet?

24   A.  Like I said, most of the times I probably talked to

25   Alex.  Like I was more close to Alex more, so most of the

 1  times I talked to Alex.

 2  Q.  Okay.  And where would you meet -- and when you say

 3  "them," are you talking about Alex and Gerard?

 4  A.  Yeah, most of the times.

 5  Q.  But -- most of the time you're saying you met Alex?

 6  A.  Alex, yes.

 7  Q.  So when you would meet Alex, what would he give you?

 8  A.  Cash.

 9  Q.  How many times, approximately, did you meet with Alex

10  and get cash?

11  A.  Probably once a week.

12  Q.  What's the most amount of cash that you remember ever

13  receiving from Alex?

14  A.  Like I said, it was maybe 50,000 probably.

15  Q.  And then what would you say, approximately, the least

16  amount of cash was that you received from Alex as you were

17  getting it once a week?

18  A.  Probably 5,000 to 10,000 maybe.

19  Q.  And then what were you doing with the cash?

20  A.  I put it in my -- I deposit the money into my account.

21  Q.  Did you open more than one account?

22  A.  Yes, ma'am.

23  Q.  And why did you open more than one account?

24  A.  So when I opened my account, I opened Chase and, I

25  believe, Wells Fargo because I already have those account.

1    So my Chase -- I believe my Chase was closed, so that kind

2    of triggers me to open another account.

3    Q.  Okay.  Your Chase account got closed?

4    A.  Yes, ma'am.

5    Q.  What happened?

6    A.  I -- they didn't know why my account was closed, so I

7    went to the bank and asked them -- actually, I asked my

8    friend Alex about it first because I didn't know what was

9    going on.

10          So he told me the same thing.  He didn't know what

11   was going on.  So I went to the banker, and I asked them

12   about it.  The bank told me he can't really give me a

13   reason why the account was closed.

14   Q.  So the account was closed, but you had another account,

15   and that was your Wells Fargo account?

16   A.  Yes, ma'am.

17   Q.  And did you continue to use that account?

18   A.  Yes, ma'am.

19   Q.  Along with placing the cash into your account, did you

20   allow your friend, Alex, to have access to your account?

21   A.  I'd probably say maybe couple times because I believe

22   Chase when you put the money in your account, you have

23   to -- the bank don't transfer the money, so you have to do

24   it by yourself.

25          So probably couple times that I was maybe at work

1   in the morning, I would just -- if they want to transfer

2   the money, I probably gave me ID to him one time or maybe,

3   I don't know, twice to transfer the money.

4   Q.  You gave Alex what information?

5   A.  Probably my -- my log-in, I believe.

6   Q.  Your log-in to log in to your account?

7   A.  Yes.

8   Q.  Your Isaac Asare Asarko account?

9   A.  Yes.

10   Q.  And you gave that information to Alex?

11   A.  Yes.

12   Q.  Now, the deposits that you were making and the access

13   to your account, what were you getting out of it?

14   A.  I believe I was making 1 percent.  Sometimes it dropped

15   to zero percent -- I mean zero point maybe six or seven.

16   Q.  And so you would get 1 percent of the amount of money

17   that you placed into the account?

18   A.  Yes, ma'am.

19   Q.  And, of course, that allowed you to make extra money

20   for the problems or the issues that you were having?

21   A.  Yes, ma'am.

22   Q.  Now let me direct your attention to Government's

23   Exhibit 159, page 2.

24          Now, you mentioned a bank account.  This is your

25   name, Isaac Asare, doing business as Asarko.  Is that your

Jury Trial Excerpt - Testimony of Isaac Asare        20

1    account?

2    A.  Yes.

3    Q.  Okay.  And the account number over here, your account,

4    ends in 0790; is that right?

5    A.  Yes.

6    Q.  So if we can look at your account, 0790, and go to

7    Government's Exhibit 159, page 23.

8           This is your account, 0790, and it's November

9    of 2019.

10          MS. RATTAN:  We can page down.

11   BY MS. RATTAN:

12   Q.  There is a wire that comes into your account that

13   you've given Alex access to, and it's for $40,000.  Is that

14   your money?

15          MR. WHALEN:  Objection to the form of the

16   question.

17          THE COURT:  Oh, overruled.

18          If you can answer, go ahead.

19   A.  Like I told you from in issuance, I never did no

20   transaction with them that it was wire.  Everything that I

21   did was cash so --

22   BY MS. RATTAN:

23   Q.  But did you give Alex your ID number to get your

24   password to get into your account?

25   A.  Like I said, that's probably maybe one or twice that I

1    couldn't transfer the money they supposed to transfer -- I

2    was supposed to transfer, and then I probably -- that's

3    probably I was at work.

4    Q.  So you had to give them your money -- your information?

5    A.  Yes.

6    Q.  Okay.  So this is $40,000.  Do you recognize this name

7    right here, James Ellett?

8    A.  No, ma'am.  Like I said, everything I did with them was

9    just cash.

10   Q.  Okay.

11   A.  And I never -- I never seen no wire come into my

12   account.  I didn't see no incoming wire into my account.

13   Q.  Okay.  But this is your account, Isaac Asare Asarko,

14   and there is a wire coming from James Ellett, and it's

15   $40,000; is that right?

16   A.  Yeah, I see that right here.  But, like I said, I never

17   seen no incoming wire, prior to my arrest, into my account.

18   Q.  They were just giving you bulk cash, and you were

19   putting the bulk cash in?

20   A.  Yes, ma'am.

21   Q.  Let me direct your attention to Government's

22   Exhibit 159, your account again.

23          MS. RATTAN:  And if we can look at page 84.

24   BY MS. RATTAN:

25   Q.  And, again, this is your account.  It's ending in 0790.

1          And we have right here, on November 26th, a wire

2    transfer related to Elichi Enterprises, and that's $9,600;

3    is that right?

4    A.  Yes.

5    Q.  And then we have another wire transfer, November 27th,

6    and that's to Chidindu Okeke.

7          Did you know who Chidindu Okeke was?

8    A.  I believe that's Gerard.

9    Q.  And that's for $9,600; is that right?

10   A.  Yes.

11   Q.  And then we've got, on November 27th, a wire for

12   $30,000 that goes international.  It's going to China; is

13   that right?

14   A.  Yes.

15   Q.  And this is all off your account?

16   A.  Yes.

17          Like I said, I never did no transaction from

18   incoming wire, so -- I'm seeing it right now, but I don't

19   have no idea where it came from.

20   Q.  You were just bulk cash.  You didn't know about the

21   wire.

22   A.  No, ma'am.

23   Q.  But you gave access to your account; is that right?

24   A.  Like I said, yes.

25   Q.  Now let me direct your attention to Government's

1  Exhibit 159, your account.

2          MS. RATTAN:  And if we can look at page 24 -- oh,

3  24?  Then if we can look at this side by side with 165.

4          We want the account information -- well, after

5  that.

6  BY MS. RATTAN:

7  Q.  So your account shows that this money is going from

8  your account to Elichi Enterprise; is that right?  $9,600.

9          Is that what you see going from your account?

10 A.  Yes.

11 Q.  So then this shows -- and this is Government's

12 Exhibit 165.  And this is First Service Credit Union, and

13 it is Elichi Enterprise that the $9,000 is going -- $9,600.

14 And it shows that the owner of this account is Chidindu

15 Okeke; is that right?

16 A.  Yes.

17 Q.  So you have Elichi Enterprises -- and you know Chidindu

18 is Gerard; is that right?

19 A.  Yes, ma'am.

20 Q.  And Elichi Enterprises according to this exhibit,

21 Government's Exhibit 159, is Chidindu Okeke.

22          And so you're Isaac Asare and your Asarko account,

23 right here, is sending $9,600 -- $9,600 to Elichi

24 Enterprises.  Is that what you see?

25 A.  Yes, ma'am.

Jury Trial Excerpt - Testimony of Isaac Asare          24

1    Q.   Now let me ask you:  The person who you did bulk cash

2    deposits for and who you gave your account information to

3    who you knew to be Alex, do you see that person in the

4    courtroom today?

5    A.   Yes, ma'am.

6    Q.   Now, if this is Person Number 1 right here, Number 2

7    right here, Number 3 right here, and Number 4 right here,

8    what Person Number would Alex be?

9    A.   Number 4.

10         MS. RATTAN:  Your Honor, may the record reflect

11   that the witness has identified Defendant Chiagoziem Okeke,

12   also known as Alex?

13         THE COURT:  The record will so reflect.

14   BY MS. RATTAN:

15   Q.   And you said that you also knew that Chidindu was

16   involved.  And you knew him by what name?

17   A.   Gerard.

18   Q.   Gerard?

19   A.   Yes, ma'am.

20   Q.   And did you ever receive any money from Gerard?

21   A.   Maybe -- I don't remember, but maybe probably -- if I

22   did, maybe probably one time.

23   Q.   Pardon me?

24   A.   I say if I did, maybe probably one or twice.

25   Q.   Okay.  Once or twice?

Jury Trial Excerpt - Testimony of Isaac Asare          25

1  A.  Maybe.

2  Q.  But you met Chidindu; is that right?

3  A.  Yes, ma'am.

4  Q.  And you knew his name was Gerard?

5  A.  Yes, ma'am.

6  Q.  Do you see him in the courtroom today?

7  A.  Yes, ma'am.

8  Q.  And then you know from the paperwork we just looked at

9  that Gerard's company, Elichi Enterprises, received $9,600

10 from your account, Isaac Asare Asarko; is that right?

11 A.  Yes, ma'am.

12 Q.  And do you see Chidindu Okeke, who you knew as Gerard,

13 in the courtroom today?

14 A.  Yes, ma'am.

15 Q.  Can you point to him and identify him?  What Person

16 Number would he be?

17 A.  Number 3.

18         MS. RATTAN:  Your Honor, may the record reflect

19 the witness has identified the Defendant Chidindu Okeke,

20 also known as Gerard?

21         THE COURT:  The record will so reflect.

22         MS. RATTAN:  And I'll pass the witness.

23         THE COURT:  Cross-examination, Mr. Linder?

24                          *

25                          *

CROSS-EXAMINATION OF ISAAC ASARE

BY MR. LINDER:

Q.  Good morning, sir.  How are you?

A.  I'm doing good.

Q.  Good.

My name is Philip Linder.  I'm only going to ask you a couple questions.

So you had this account in Houston under your business name, Asarko, correct?

A.  Yes, sir.

Q.  And you -- so other people, the Okeke brothers, used your account to do all the wires in and out.  You didn't do that, correct?

A.  No, sir.

Q.  Okay.  So other people were using your account without your permission?

A.  Well, like I said, Chase -- I believe Chase or Wells Fargo when you deposit the money, they don't do the transfer by themself, so you have to do it by yourself.

Q.  Okay.  But if somebody was -- if these transactions were happening in and out, they didn't call and ask your permission each time, did they?  They would just use your account because they knew all the log-in credentials, correct?

A.  No.  They would call me and ask me, hey, we tried to

1    transfer this money.

2    Q.  Okay.

3    A.  Yes.

4    Q.  But you weren't familiar with the names of people

5    coming in and out of the account, were you?

6    A.  No.  Like I said, everything -- everything I -- we did

7    was cash.  I took cash from them, put it in my account, and

8    just wired out.  I didn't see no wire coming in --

9    Q.  Okay.

10   A.  -- all these times.

11   Q.  Thank you very much.

12   A.  Yes, sir.

13          THE COURT:  Mr. Smith, do you have any questions?

14          MR. SMITH:  No questions, your Honor.

15          THE COURT:  Mr. De la Garza.

16              CROSS-EXAMINATION OF ISAAC ASARE

17   BY MR. DE LA GARZA:

18   Q.  Good morning.

19   A.  Good morning.

20   Q.  How are you doing this morning?

21   A.  I'm doing good, yes, sir.

22          THE COURT:  Mr. De la Garza, is your mic on?

23          MR. DE LA GARZA:  Yes, your Honor.

24          THE COURT:  Okay.  Make sure you use it.

25   A.  Please come again.

 1  BY MR. DE LA GARZA:

 2  Q.  Are you a little uncomfortable this morning?

 3  A.  I'm good.

 4  Q.  You're good?

 5  A.  Yes, sir.

 6  Q.  I want to talk about the Okeke brothers.

 7  A.  Yes, sir.

 8  Q.  I want to talk about your involvement in this -- in

 9  this case.

10  A.  Yes, sir.

11  Q.  You were arrested back in September of '21; is that

12  right?

13  A.  Yes, sir.

14  Q.  And then you pled guilty three years later.  Is that

15  about right?

16  A.  Yes, sir.

17  Q.  And for all that time period, you were insisting that

18  you were not guilty; is that correct?

19  A.  Yes, sir.

20  Q.  And then all of a sudden the light club goes off, you

21  have a come-to-Jesus moment, and then now you're guilty; is

22  that correct?

23          MS. RATTAN:  Of course, this is argumentative.

24          THE COURT:  Overruled.

25  A.  Yes, sir.

Jury Trial Excerpt - Testimony of Isaac Asare          29

```
 1   BY MR. DE LA GARZA:
 2   Q.  Part of your Plea Agreement, standard plea agreements
 3   in this district, is that you must be honest and truthful,
 4   correct?
 5   A.  Yes, sir.
 6   Q.  Why don't you tell the ladies and gentlemen of this
 7   jury what you told the judge, the magistrate judge, when
 8   she asked you, "In your own words, what did you do in this
 9   case?"
10        What did you tell that judge?
11   A.  I told the judge I deposit money into my account.
12   Q.  Okay.  And what else?
13   A.  I believe I told them I deposit money into my account
14   from activities that -- I'm trying to remember the
15   statement that I told the judge.  But I -- I believe I
16   said -- I think I said I deposit money from -- into my
17   account from one activity.
18   Q.  From one activity?
19   A.  Yes.
20   Q.  And you're telling the ladies and gentlemen of the jury
21   here there were multiple activities, right?
22   A.  Yes.
23        MS. RATTAN:  Your Honor, I'm sorry.  I think that
24   was a misunderstanding.
25        THE COURT:  Overruled.  You can clear that up.
```

1          MS. RATTAN:  Okay.

2     BY MR. DE LA GARZA:

3     Q.  So now you're telling the ladies and gentlemen of the

4     jury there were multiple activities; is that correct?

5          THE COURT:  Speak into the mic, Mr. De la Garza.

6          MR. DE LA GARZA:  Thank you, your Honor.

7     BY MR. DE LA GARZA:

8     Q.  Now you're telling these folks that it was multiple

9     activities, correct?

10    A.  Yes.

11    Q.  And you didn't tell the judge anything about the Okeke

12    brothers, did you?

13          MS. RATTAN:  Well, I object.  That's misleading.

14    He pled guilty to conspiracy and, as the Court knows, the

15    defendant doesn't allocute about co-conspirators at the

16    time.

17          MR. DE LA GARZA:  Your Honor, I do believe

18    sometimes some defendants when they do plead guilty and

19    they are in front of a court, they do -- some are a little

20    bit more specific when they're allocuting in what they did.

21    So I'm just asking him what he did.

22          THE COURT:  Well, Mr. De la Garza, I mean, since

23    I've taken over a thousand guilty pleas, I don't remember

24    any of those pleas on a conspiracy charge -- them

25    identifying by name who the co-conspirators were, just that

 1    they agreed with one or more persons to do something, so --

 2          MR. DE LA GARZA:  He could have asked -- he could

 3    have answered that, your Honor, is the whole point.  He

 4    could have been more specific.

 5          THE COURT:  It's not required for the Court to

 6    accept a guilty plea so --

 7          MS. RATTAN:  Well, and our point is it's

 8    misleading to imply that he should have because it's not --

 9          THE COURT:  Again, I mean, if you want to follow

10    this line, I will instruct the jury that it's not necessary

11    if you want me to so -- but go ahead.

12          MR. DE LA GARZA:  Thank you, your Honor.

13    BY MR. DE LA GARZA:

14    Q.  So you had an opportunity -- you had an opportunity

15    several months ago to come in and plead guilty, correct,

16    and you took that opportunity?

17    A.  Yes, sir.

18    Q.  Since then, have you had opportunities to meet with the

19    Government?

20    A.  Yes, sir.

21    Q.  And when you met with the Government, you were a little

22    bit more forthright than your first interview with agents

23    down in Houston; is that correct?

24    A.  Yes, sir.

25    Q.  In your first meeting with the agents, it was a quick

Jury Trial Excerpt - Testimony of Isaac Asare            32

1    meeting; is that correct?

2            MS. RATTAN:  Your Honor, I think some of this will

3    go to the Court's order -- previous order.

4            THE COURT:  Well, just --

5            MR. DE LA GARZA:  We're talking about prior

6    statements, your Honor -- may we approach?

7            THE COURT:  Go ahead and proceed.

8    BY MR. DE LA GARZA:

9    Q.  You had a meeting with the Government when you were

10   arrested; is that correct?

11   A.  Yes, sir.

12   Q.  And after that meeting, you've had several more

13   meetings where you've discussed more and more each time?

14   A.  Yes, sir.

15   Q.  When was the first time you met with the agents present

16   at this table?

17           Matthews, did you ever meet with him?

18   A.  Which one, please?

19   Q.  The tall one right here -- well, he's sitting down

20   so -- this guy right here, did you ever meet with him?

21   A.  I don't remember the face.  I --

22   Q.  Don't worry.

23   A.  I'm not really sure if I did.

24   Q.  Okay.

25   A.  But I might probably.

1   Q.   Do you remember meeting with any agents of the

2   Government?

3   A.   Yes, please.

4   Q.   And where did you meet with them?

5   A.   I believe Fannin County.

6   Q.   Okay.  And were you in the back room out there by the

7   library?

8   A.   Yes, please.

9   Q.   And it's not a very big room, is it?

10  A.   No, sir.

11  Q.   And who all was present when you met with the

12  Government?

13  A.   The agent, I believe my lawyer, and then I think the

14  prosecutor.

15  Q.   Okay.  And approximately -- I know you don't carry a

16  watch in there, but how long did that meeting take place?

17  A.   Maybe a hour, from maybe 45 minutes to a hour, I

18  believe.

19  Q.   Okay.  And during the course of that meeting, did you

20  have an opportunity to tell the Government what happened?

21  A.   Yes.

22  Q.   Your direct examination was about -- what? -- 20

23  minutes maybe --

24  A.   Yes, please.

25  Q.   -- this morning?

1   A.  Yes, please.

2   Q.  But, yet, you spoke to them for an hour?

3   A.  Yes, please.

4   Q.  Was there a lot of questions going back and forth

5   between the Government and you?

6   A.  Yes, please.

7   Q.  At any point in time, did any members of the Government

8   question you, try to get you to remember, remind you to be

9   honest, remind you to be forthright?

10          Did any of that happen?

11          MS. RATTAN:  Your Honor, these are all

12  out-of-court statements.  We would object to the way the

13  questioning is being --

14          THE COURT:  Just rephrase.

15          MR. DE LA GARZA:  I'll be happy to, your Honor.

16  BY MR. DE LA GARZA:

17  Q.  At any point in time during your meetings with the

18  Government, did your proffer stop and then start again?

19  A.  I believe so.

20  Q.  And is it your hope and desire that you receive some

21  benefit for coming into court today and that hopefully this

22  Honorable Court will determine whether you're honest and

23  truthful and lower your sentence, if appropriate?

24  A.  No, sir.

25          I told the prosecutor I didn't want to do this.  I

1    told them everything, and I told them from the beginning

2    the same thing I'm telling you right now and everything is

3    just the truth.  And now I'm telling them -- I tell them

4    I'm not doing this just to receive --

5    Q.  Benefit.

6    A.  -- benefit.  I'm just telling the truth.

7    Q.  So if you get a benefit --

8    A.  Because --

9    Q.  Go ahead.

10   A.  Because my involvement from this crime was I deposit

11   money from -- I mean cash into my account.  That's what I

12   did, and I didn't -- did I know something was going on that

13   it was defraudment?  I didn't know, but I made probably --

14   I made a wrong decision just taking money from my account

15   and just -- I mean from my friends and put in my account.

16   But --

17   Q.  Let me see if I understand you correctly.

18   A.  Yes, sir.

19   Q.  At the time you were depositing money into your

20   account --

21   A.  Yes, sir.

22   Q.  -- and at the time your account was sending money out,

23   did you believe you were doing anything wrong, at that

24   moment in time?

25   A.  At that moment, no, because I trusted my friend.

 1    Q.  All right.  Hold on.  You trusted somebody, right?

 2    A.  Yes, sir.

 3    Q.  Did they ever tell you that the money you were

 4    receiving was dirty money?

 5    A.  No.

 6              MR. DE LA GARZA:  Pass the witness, your Honor.

 7              THE COURT:  Mr. Whalen?

 8                    CROSS-EXAMINATION OF ISAAC ASARE

 9    BY MR. WHALEN:

10    Q.  Good morning, sir.  How are you?

11    A.  I'm doing great here, sir.

12    Q.  Thank you.

13          Is it Asar (phonetic) or Asare?

14    A.  Asare.

15    Q.  Asare?

16    A.  Yes, sir.

17    Q.  Okay.  Good morning to you.

18          So what year were -- how old are you right now?

19    What year were you born in Ghana?

20    A.  31.

21    Q.  31?

22    A.  Yes, sir.

23    Q.  Okay.  And you stated earlier you were raised in Ghana,

24    correct?

25    A.  Yes, sir.

 1   Q.  Okay.  Any brothers and sisters?

 2   A.  Yes, sir.

 3   Q.  All right.  How many --

 4   A.  Four brothers, two sisters.

 5   Q.  Okay.  And if you could do me a favor, just -- if you

 6   could -- let's just try to slow down, okay?  We've got

 7   time.

 8   A.  Okay.

 9   Q.  So you've got four brothers and two sisters, correct?

10   A.  Yes, sir.

11   Q.  Okay.  Are you the oldest?

12   A.  No, sir.

13   Q.  Okay.  Where do you fit in the pecking order?

14   A.  On my mom's side, I'm the second born.

15   Q.  Okay.

16   A.  But my dad have a lot of kids, so I don't know where I

17   fit at in my dad kids.  I got to -- I got to really think

18   about it.

19   Q.  Okay.  All right.  So just so I'm clear, you entered

20   the lottery to hopefully get a visa to come to United

21   States, correct?

22   A.  Yes, sir.

23   Q.  Okay.  What was the type of visa that you got?

24   A.  It was DV1, I believe.

25   Q.  Okay.  And so -- help me understand if -- the program

1  was you applied for this visa that after high school

2  graduation, you hopefully could come to the United States,

3  correct?

4  A.  Yes, sir.

5  Q.  Okay.  And what did you -- did you have to do in order

6  to apply for the DV1 visa?

7  A.  I believe we had to have a high school diploma.

8  Q.  Okay.

9  A.  Yeah.

10  Q.  And did you have to fill out some forms from the United

11  States?

12  A.  We did.

13  Q.  Okay.  And how many forms did you have to fill out for

14  the United States?

15  A.  I don't remember the exact number, but I believe

16  probably a lot.

17  Q.  A lot?

18  A.  Yeah.

19  Q.  Okay.  And on part of those forms, did you have to make

20  sure you told the truth, correct?

21  A.  Yes, sir.

22  Q.  Okay.  And you told the truth on those forms so you

23  could come to the United States, correct?

24  A.  Yes, sir.

25  Q.  Okay.  Why did you want to come to the United States?

1   A.  Better my life, then take care of my mom, my dad, and

2   my siblings.

3   Q.  Okay.  And did you feel that coming to the United

4   States, you had a better opportunity to better your life?

5   A.  Yes, sir.

6   Q.  Okay.  And your goal of coming to the United States was

7   to make money and support your family back in Ghana?

8   A.  Yes, sir.

9   Q.  Was the hope to also bring your family to the United

10  States?

11  A.  Partly so.

12  Q.  Okay.  Did you consider applying for an F1 visa?

13  A.  No, because I already had the DV1 which do not allow me

14  to do that, I believe.

15  Q.  Okay.

16  A.  Or it was not necessary for me to do that.

17  Q.  And just so we understand, an F1 visa is a visa to come

18  to the United States to study, correct?

19  A.  Yes, sir.

20  Q.  And since you got the DV visa, you didn't need to apply

21  for that, correct?

22  A.  Yes, sir.

23  Q.  Okay.  But your intent, too, I think I heard you say,

24  was to get your education, correct?

25  A.  Yes, sir.

 1   Q.   Okay.  And what education were you hoping to get here

 2   in the United States?

 3   A.   I've always liked math and science, so I wanted to

 4   become engineer.

 5   Q.   What type of engineering?

 6   A.   I always wanted to do petroleum engineering.  But

 7   because of gas and oil prices were just going up and down

 8   and people getting fired -- I mean getting -- losing their

 9   job, so I had my mind on chemical engineering.

10   Q.   Okay.  And did you have in mind a plan to go to school?

11   A.   I did, please.

12   Q.   Okay.  Where did you want to go to school?

13   A.   I started Houston Community College, took some classes,

14   and then I transferred to University of Houston.

15   Q.   Okay.  In what year did you do that?

16   A.   I believe I started 2017, I believe.

17   Q.   All right.  And then you said you had this plan that

18   you -- business plan you developed, correct?

19   A.   Yes, sir.

20   Q.   Okay.  And you talked about an ex-girlfriend.  What was

21   her name?  Jennifer?

22   A.   Jennifer.

23   Q.   Okay.  And Jennifer had a sister, correct?

24   A.   Yes.

25   Q.   Okay.  And what was her name?

1  A.  Jessica.

2  Q.  Jessica?

3  A.  Yes, please.

4  Q.  And Jessica at some point was dating Alex, correct?

5  A.  Yes, please.

6  Q.  Okay.  Now, did it come to your attention or did you

7  ask Jessica to talk to Alex because he had some business

8  knowledge?

9  A.  I think they -- they enlightened me on that that,

10 like -- they told me about what business Alex and his

11 brother was doing.

12 Q.  Okay.  And I think you testified that -- well, let me

13 back up.

14         They mentioned it.  Did you then ask, hey, I'd

15 like to meet him to kind of pick his brain?

16 A.  Yes, I did.

17 Q.  Okay.  And did Jessica set up that introduction?

18 A.  Yes, I did.

19 Q.  Okay.  And you said that happened in 2018, correct?

20 A.  I'm not exactly what date, but I believe '18 or '19

21 maybe.

22 Q.  Okay.  And I think you testified that Alex had a

23 trucking or transport business, correct?

24 A.  Yes, please.

25 Q.  Okay.  And that transport business was to transport

 1    cars back and forth between -- through Texas, mainly Dallas

 2    to Houston, correct?

 3    A.  Yes, please.

 4    Q.  Did you also know that the brothers -- or at least

 5    Alex -- were owners of a nightclub or a sports bar?

 6    A.  That's just probably maybe two months before -- prior

 7    to our arrest.  That's when I knew.

 8    Q.  Okay.

 9    A.  Yeah.

10    Q.  And do you remember the name of it?

11    A.  No, I don't.

12    Q.  Does the name Vibes sound familiar?

13    A.  It sounds familiar.

14    Q.  Okay.  Had you ever been to Vibes?

15    A.  No.

16    Q.  Okay.  But you knew it existed, correct?

17    A.  Yes, please.

18    Q.  It was an actual business, correct?

19    A.  Yes, please.

20    Q.  Now, you said Alex gave you some information about bank

21    accounts, correct?

22    A.  I said business account --

23    Q.  Okay.

24    A.  -- business ideas.

25    Q.  And did you set up -- when did you come up with the

1  name Asarko?

2  A.  Like I said, I already had the plan of what I wanted to

3  do.  So I already had that name because I used my last

4  name, and then I just reframe it.

5  Q.  Okay.  Does it have any other special meaning other

6  than you reframed your last name?

7  A.  Come again.

8  Q.  Forget it.  It's a poor question.

9         So he asked you to set up -- did he ask you to set

10  up an LLC or a D/B/A, a doing business as?

11  A.  He just enlightened me how to open the account so it

12  would -- I did D/B/A.

13  Q.  Okay.  And did you fill out a D/B/A form and file it

14  with the Clerk in Harris County?

15  A.  Yes, I did.

16  Q.  Okay.  Did you lie on that form?

17  A.  No.

18  Q.  Okay.  Did Alex tell you to file any forms that were

19  fraudulent or --

20  A.  No.

21  Q.  -- fake?

22  A.  No.

23  Q.  Okay.  When he told you to set up a business account,

24  did he tell you to lie to any banking officials?

25  A.  No.

1   Q.  Did he tell you to use a different name or a fake ID?

2   A.  No.

3   Q.  And have you studied any type of -- taken any type of

4   business classes or studied business, whether in high

5   school or just talking to other folks?

6   A.  Yeah.  I'd probably say I did.

7   Q.  Okay.  And it makes sense, does it not, that if you're

8   running a business, you want to set up a business account,

9   correct?

10  A.  Yes.

11  Q.  Okay.  And you want to set up a business account

12  because that way you can keep track of revenue and keep

13  track of expenses, correct?

14  A.  Yes, please.

15  Q.  And you don't commingle that with your personal,

16  correct?

17  A.  Yes, please.

18  Q.  That's just standard business practice, correct?

19  A.  Yes.

20  Q.  Now I want to clarify some of your testimony.  Just so

21  I'm clear and the jury is clear, you only ever received

22  cash from Alex, correct?

23  A.  Yes, sir.

24  Q.  Okay.  And you asked him -- he accessed your account

25  only two times, correct?

1  A.  Probably so.

2  Q.  You had Chase Bank, correct?

3  A.  Yes, please.

4  Q.  Did you have an app on your phone?

5  A.  Yes.

6  Q.  Did you keep track of your account?

7  A.  Yes.

8  Q.  Would you know when somebody logged into it or not?

9  A.  I think it would -- it would tell you.

10  Q.  Okay.  And so as you sit here today, it was one to two

11  times, correct?

12  A.  Probably so, yeah.

13  Q.  Okay.  And you would give him the information, correct?

14  A.  Yes.

15  Q.  Okay.  Now I think you testified on a couple things

16  about -- you were asked about these wires, correct?

17  A.  Yes.

18  Q.  Okay.  And you said, I think at one point, you didn't

19  know about the wire, correct?

20  A.  Yes, sir.

21  Q.  Okay.  But I think you also said that for a wire to

22  happen, you have to be the one to initiate it, correct?

23  A.  Ask that again, please.

24  Q.  Correct me if I'm wrong, but I thought you said on

25  direct examination that if you are initiating a wire at

1   Chase, you are the one who has to initiate it.

2   A.  I said Chase -- that when we did put money in the

3   account, you -- that the banker don't transfer the money,

4   so you have to -- you have to do it by yourself.

5   Q.  Okay.  And did you do that by yourself?

6   A.  Yeah.  Sometimes I did.

7           And when I -- when I can't do it, that's probably

8   one or two -- twice that I probably gave my log-in to my

9   friend to just send the money.

10  Q.  Okay.  But every other time, you initiated those

11  transfers of money, correct?

12  A.  Yes, sir.

13  Q.  Okay.  Now, also when you -- you took cash to the bank,

14  correct?

15  A.  Yes, sir.

16  Q.  Okay.  And when you took cash to the bank, you gave

17  them your ID, correct?

18  A.  Yes, sir.

19  Q.  Did you have to talk to a teller?

20  A.  Yes, sir.

21  Q.  Did the teller ask you about where the money came from?

22  A.  They don't ask me what -- I mean -- they knew that I

23  had a business, which is the Asarko.  So they really don't

24  ask me where the money came from.

25  Q.  Okay.  And just so -- if you can tell me, what amounts

1  did you deposit into the account?

2  A.  Like I said to the court, probably the largest probably

3  I took, maybe 80 -- I mean 50,000.

4  Q.  Okay.  And when you had that $50,000 cash, did you

5  deposit the whole $50,000 at one time?

6  A.  Yes, sir.

7  Q.  You didn't break it up, did you?

8  A.  No, sir.

9  Q.  Alex never told you to break anything up, did he?

10  A.  Not that I think of.

11  Q.  Okay.  Because if he did, that's something you would

12  have told the prosecutors and the agents, correct?

13  A.  Yes, sir.

14  Q.  Now, there was some mention of currency exchange,

15  correct?

16  A.  Yes, sir.

17  Q.  Okay.  And did you engage in currency exchange?

18  A.  I mean, I believe that's what we was doing.

19  Q.  Okay.  And is the standard fee on currency exchange

20  1 percent?

21  A.  Yes, sir.

22  Q.  Now let's talk about your Plea Agreement.  I know

23  Mr. De la Garza talked to you about it, but let's go to

24  page 278 -- I got my papers out of order here.

25          MR. WHALEN:  All right.  Page 3, please.  278-3,

 1  Ms. Adams.  Thank you.

 2  BY MR. WHALEN:

 3  Q.  Do you see that in front of you, Mr. Asare?

 4  A.  Yes, sir.

 5  Q.  Okay.  And if we look through letters A through E, you

 6  don't agree with the Government about any of the specifics

 7  of the case, do you?

 8  A.  Yes, sir.  I don't.

 9  Q.  You don't?

10  A.  Yes, sir.

11  Q.  Okay.  In Paragraph A, you don't agree with what the

12  loss amount should be, correct?

13  A.  Yes, sir.

14  Q.  You don't agree whether or not there should be any --

15  the number of victims or if somebody suffered substantial

16  hardship, correct?

17  A.  Yes, sir.

18  Q.  You don't agree that you -- the case involved multiple

19  financial accounts and transfer of ill-gotten funds.  You

20  don't agree with that, do you?

21  A.  Yes, sir.

22  Q.  And you don't agree that the scheme involved relocating

23  funds to foreign jurisdictions, do you?

24  A.  Yes, sir.

25  Q.  Okay.  And you don't agree that it affected vulnerable

 1   victims, correct?

 2   A.  Yes, sir.

 3          MR. WHALEN:  Okay.  Thank you, Ms. Adams.

 4   BY MR. WHALEN:

 5   Q.  And so -- but you're here today saying you're guilty

 6   but not with what the Government thinks the facts are,

 7   correct?

 8   A.  Yes, sir.

 9   Q.  Okay.  But you're hoping to get a benefit for

10   testifying today?

11   A.  Well, like I said, I just came over here to tell what I

12   did, to --

13   Q.  Okay.

14   A.  -- tell the truth.

15   Q.  All right.  Now, I think I heard you say that you

16   didn't know about these wires in your account.

17          Is that correct?

18   A.  Yes, sir.

19   Q.  What year did you come to the country, again, come to

20   America?

21   A.  2013, I believe May.

22   Q.  Okay.  And so in -- and you met Alex in 2018, correct?

23   A.  Probably so.

24   Q.  Okay.  Do you remember Alex going into the Army?

25   A.  Yes, sir.

1    Q.  Okay.  What year did he go into the Army?

2    A.  I don't remember the exact year, but I knew he was in

3    the Army.

4    Q.  Okay.  And did he go into the Army and then was away

5    for quite some time?

6    A.  Yes, sir.

7    Q.  So if he went -- if you met him in -- did you meet him

8    in 2018 and then he went into the Army, or do you know

9    exactly when you first met him and when he went into the

10   Army?

11   A.  I know he used to go to camp, training.  But I don't

12   remember, like, the date that he leave and come back.

13   Q.  So if he was away at the Army, you didn't see him every

14   week, did you?

15   A.  No, sir.

16   Q.  Okay.  You didn't see him every day, did you?

17   A.  No, sir.

18   Q.  You guys didn't hang out on a daily basis together, did

19   you?

20   A.  No, sir.

21   Q.  Now, I know you're up here and you said you're guilty,

22   but a few more questions I need to ask you.

23           Well, let me ask you this first before I get

24   there:  You got arrested on September 27th, 2021, correct?

25   A.  Yes, sir.

```
 1    Q.  Okay.  Did you have any idea you were going to get

 2    arrested that day?

 3    A.  No, sir.

 4    Q.  Okay.  Complete shock to you?

 5    A.  It was.

 6    Q.  Okay.  Nobody had ever contacted you from law

 7    enforcement before?

 8    A.  No, sir.

 9    Q.  Okay.  Nobody ever -- nobody from a bank ever said

10    anything to you about --

11    A.  No, sir.

12    Q.  -- your transactions?

13    A.  No, sir.

14    Q.  So what time did you get arrested that morning?

15    A.  Probably 8:30 to 9:00.

16    Q.  Okay.

17    A.  My way from work, going home.

18    Q.  You worked the night shift at Frito-Lay?

19    A.  I be working Frito-Lay eight years night shift, going

20    to school.  So I worked night shift for eight years --

21    Q.  Okay.

22    A.  -- prior to my arrest.

23    Q.  How much money were you making at Frito-Lay per month?

24    A.  I'd say maybe -- depending overtime -- 4- to 6,000 a

25    month.
```

Jury Trial Excerpt - Testimony of Isaac Asare          52

1   Q.  4- to 6,000 a month?

2   A.  Depending overtime.

3   Q.  Okay.  And so you're going to Frito-Lay, trying to get

4   your education, trying to make some extra money, and then

5   one day you get arrested by a couple FBI agents, correct?

6   A.  Yes, sir.

7   Q.  Life-changing event, correct?

8   A.  It is.

9   Q.  Okay.  And since that time, you've been sitting in

10  jail, correct?

11  A.  Yes, sir.

12  Q.  Okay.  And as Mr. De la Garza said, you didn't sign

13  your Plea Agreement until --

14  A.  October.

15  Q.  October of 2023, correct?

16  A.  Yes, sir.

17  Q.  And even after signing that Plea Agreement, you still

18  disagree with the Government on a lot of things, correct?

19  A.  Yes, sir.

20  Q.  Okay.  When you were engaged -- when you were

21  depositing money into the account, at the time you were

22  doing it was it your intent to cheat or deceive somebody?

23  A.  No, sir.

24  Q.  At the time you were depositing money in the account,

25  were you knowingly, intentionally violating the law as you

 1  knew it at that time?

 2  A.  No, sir.

 3  Q.  Did you make any false material misrepresentations to

 4  anyone?

 5  A.  No, sir.

 6  Q.  Were you trying to disguise any money?

 7  A.  No, sir.

 8  Q.  Were you trying to conceal money?

 9  A.  No, sir.

10  Q.  So after you get arrested -- well, let me back up.

11        Before you got arrested, as far as you knew, you

12  were not intending to violate the law, correct?

13  A.  No, sir.

14  Q.  That was not your purpose?

15  A.  No, sir.

16  Q.  You didn't agree with anyone else to violate the law,

17  did you?

18  A.  No, sir.

19  Q.  You had no knowledge of any type of agreement, did you?

20  A.  No, sir.

21  Q.  Did you specifically agree with anyone, including Alex,

22  that you were violating the law?

23  A.  No, sir.

24  Q.  Was that your specific intent to violate the law?

25  A.  No.

1   Q.  And so now that you've been arrested and people show

2   you wire transactions, somebody has convinced you that you

3   violated the law, correct?

4   A.  Yeah, from what I'm seeing in my account.

5   Q.  Okay.  From what you're seeing in your account.

6          But, Mr. Asare, in your heart of hearts, did you

7   ever set out to violate the law?

8   A.  No, sir.

9   Q.  Did you ever agree with anyone to violate the law?

10  A.  No, sir.

11         MR. WHALEN:  I'll pass the witness.

12         THE COURT:  Additional questions from the

13  Government?

14         MS. RATTAN:  Yes, your Honor.

15         Your Honor, may we publish Government's

16  Exhibit 278, page 1, paragraph 2?

17         THE COURT:  Yes.

18              REDIRECT EXAMINATION OF ISAAC ASARE

19  BY MS. RATTAN:

20  Q.  Mr. Asare, this is your Plea Agreement there.  In

21  paragraph 2, you entered before a court and you entered a

22  plea of guilty to conspiracy to commit wire fraud.

23         And you've just said, well, I didn't know the

24  money was dirty.

25         That was dirty money, $50,000 cash that you

1  received from Alex and put into your account; is that

2  right?

3          MR. WHALEN:  Objection.  Counsel is testifying.

4  A.  Can I say something, please?

5          THE COURT:  Yeah, go ahead and answer.

6  A.  Like I said from the first day I met you, it was

7  brought to my attention the money that I was receiving was

8  from foreign exchange and the money was being verified

9  from -- I don't know what the money was coming from, but

10  the money was being verified from -- my friends say the

11  money was being verified, so I didn't know the money was

12  being dirty at that time.  I didn't know.

13  BY MS. RATTAN:

14  Q.  But it was dirty.  It was dirty money.  It was stolen

15  money.

16  A.  I didn't know at that time.

17  Q.  Well --

18  A.  From what they was telling me, they was telling me

19  wherever the money was coming from was being verified.  The

20  person told them the money was good.

21          I never had no intention to defraud nobody.  My

22  dad is getting close to 80 years, and I know how it is to

23  defraud old people or for just somebody.  My mom have

24  stroke right now, and I would never do that.

25          I came to United States, like I said, just to help

 1  my family, and then I never had intention to do something

 2  that -- if I knew it was wrong, I wouldn't do it.

 3  Q.  Okay.  So, Mr. Asare, you're saying that you didn't lie

 4  and you haven't lied.

 5         But if it was stolen money, did someone lie to

 6  you?

 7  A.  Yes.

 8  Q.  Who lied to you about where the money came from?

 9  A.  I can't tell that it's my friends because they told me

10  they verified the money from the source of the money.

11  Q.  That's what they told you?

12  A.  That's what they told me.

13  Q.  Is that right?

14  A.  Yes, please.

15  Q.  Okay.  And there were transfers that were made after

16  you gave your account information that you didn't know

17  about.  Is that what you're saying?

18  A.  Yes, ma'am.

19         MS. RATTAN:  If we can publish Government's

20  Exhibit 159, pages 23 and 24.

21  BY MS. RATTAN:

22  Q.  This was a transfer into your account, and you're

23  saying you didn't transfer that money into your account; is

24  that right?

25         It came from James Ellett, and it's $40,000.  Do

1  you know who James Ellett is?

2  A.  No, ma'am.

3  Q.  You never met James Ellett?

4  A.  No, ma'am.

5  Q.  You never asked who James Ellett was?

6  A.  No, ma'am.

7  Q.  Did you see that name come into your account?

8  A.  No.

9  Q.  Where did it come from?

10 A.  I don't have no idea.

11 Q.  Who did you give your account information to?

12 A.  My friend.

13        But I don't know he did it or not.

14 Q.  Okay.  Well, your friend, are you talking about Alex?

15 A.  Yes, please.

16 Q.  Okay.  Now, Mr. Asare, Alex's attorney was asking you

17 what you knew and what you thought at the time that you

18 deposited it and whether you thought you were involved in a

19 conspiracy.

20        You have an attorney, and you worked with your

21 attorney.  His name is Christian Capitaine; is that right?

22 A.  Yes, ma'am.

23 Q.  And he appeared with you when you pled guilty?

24 A.  Yes.

25 Q.  And you accepted responsibility for what was going on

1   in your account; is that right?

2   A.   Yes.

3   Q.   And you know that the law is also if you look the other

4   way and pay no attention, if you deliberately --

5            MR. WHALEN:   Objection.   Counsel is testifying.

6            MS. RATTAN:   It's proper redirect to --

7            THE COURT:   Overruled.   Go ahead.

8   BY MS. RATTAN:

9   Q.   If you deliberately look the other way, if you place

10  your head in the sand and don't find out where the money

11  came from, then you're also responsible as if you knew.   Do

12  you understand that?

13  A.   I understand that, and that's why I took a plea because

14  I trusted my friends because -- I mean, I know him.   He was

15  in the Army.   He serving the country, and then I -- since I

16  know him, he never do anything wrong to me.   And I believe

17  what he said, that he verified the source of the money.

18  Q.   Uh-huh.

19  A.   And -- but I just -- I just can't tell if the money was

20  dirty or not, and that's why I'm taking my responsibility.

21  Just taking money from somebody and putting it in my

22  account, that's why I'm taking my responsibility at and

23  taking the plea.

24  Q.   And you took money, and you were willing to put

25  Mr. Ellett's money -- from Colorado -- into your account;

1   is that right?

2   A.  I never knew at that time that was coming from --

3   Q.  Virginia --

4   A.  -- Mr. James because, like I said earlier, every

5   transaction that I did was not wired coming into my

6   account.  It was cash from my friends to my account.

7   Q.  And then that same portion of that same money was going

8   to Elichi Enterprise; is that right?

9   A.  Right now I seen it.  But, like I said, I never seen

10  money from -- coming from somebody and being transferred to

11  another person.  The money that was being transferred to

12  different account was money that -- cash I took and deposit

13  that money into my account.  That was money that was being

14  transferred.

15  Q.  And that bulk cash that you got time after time once a

16  week, once a week, once a week, who did you get it from?

17  A.  My friend.

18  Q.  And who is that?

19  A.  Alex.

20          MS. RATTAN:  Okay.  I'll pass the witness.

21          THE COURT:  Additional questions?

22          MR. DE LA GARZA:  No questions, your Honor.

23          MR. LINDER:  No questions.

24          THE COURT:  Mr. Whalen.

25                                *

```
 1                   RECROSS-EXAMINATION OF ISAAC ASARE
 2  BY MR. WHALEN:
 3  Q.  Alex -- Mr. Asare --
 4  A.  Yes, sir.
 5  Q.  -- as you previously -- as you just stated, you had a
 6  relationship with Alex, correct?
 7  A.  Yes, sir.
 8  Q.  You interacted with Alex?
 9  A.  Yes, sir.
10  Q.  You knew him to be in the Army?
11  A.  Yes, sir.
12  Q.  You interacted with him on a regular basis?
13  A.  Yes, sir.
14  Q.  And based on all those interactions, you believed him
15  to be an honorable, truthful, credible person, correct?
16  A.  Yes, sir.
17          MR. WHALEN:  I'll pass the witness.
18          THE COURT:  Anything else?
19          MS. RATTAN:  No, your Honor.
20          THE COURT:  Can this witness be fully excused?
21          MS. RATTAN:  Yes, please.
22          THE COURT:  Hearing no objections, sir, your
23  testimony is finished.  Thank you.
24          THE WITNESS:  Thank you, sir.
25          (Excerpt of proceedings concluded.)
```

1  COURT REPORTER'S CERTIFICATION
          I HEREBY CERTIFY THAT ON THIS DATE, MAY 20, 2024,
2  THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF
   PROCEEDINGS.
3                   /s/_____
                 CHRISTINA L. BICKHAM, CRR, RDR
4

5

6

7

8

9                           INDEX

10                                              PAGE

11  DIRECT EXAMINATION BY MS. RATTAN            3
    CROSS-EXAMINATION BY MR. LINDER             26
12  CROSS-EXAMINATION BY MR. DE LA GARZA        27
    CROSS-EXAMINATION BY MR. WHALEN             36
13  REDIRECT EXAMINATION BY MS. RATTAN          54
    RECROSS-EXAMINATION BY MR. WHALEN           60
14
    COURT REPORTER'S CERTIFICATION              61
15

16

17                  INDEX OF EXHIBITS

18  Government's Exhibit 278                     3

19  Government's Exhibit 159                     19

20  Government's Exhibit 165                     23

21  Government's Exhibit 278                     54

22  Government's Exhibit 159                     56

23

24

25