```
 1                 UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF TEXAS
 2                      SHERMAN DIVISION

 3   UNITED STATES OF AMERICA     |  DOCKET 4:21-CR-253(28)
                                  |
 4                                |  FEBRUARY 13, 2024
     VS.                          |
 5                                |  2:55 P.M.
                                  |
 6   KINGSLEY OZIEGBE             |  SHERMAN, TEXAS

 7   ------------------------------------------------------------

 8         VOLUME 1 OF 1, PAGES 1 THROUGH 38

 9       REPORTER'S TRANSCRIPT OF SENTENCING HEARING

10     BEFORE THE HONORABLE AMOS L. MAZZANT, III,
                UNITED STATES DISTRICT JUDGE
11   ------------------------------------------------------------

12

13   APPEARANCES:

14   FOR THE GOVERNMENT:     JAY R. COMBS
                             U.S. ATTORNEY'S OFFICE - PLANO
15                           101 E. PARK BOULEVARD, SUITE 500
                             PLANO, TX 75074
16

17

     FOR THE DEFENDANT:      GABRIEL REYES
18                           LAW OFFICE OF GABRIEL REYES PLLC
                             2600 STATE STREET
19                           DALLAS, TX 75204

20

21   COURT REPORTER:         CHRISTINA L. BICKHAM, CRR, RDR
                             FEDERAL OFFICIAL REPORTER
22                           101 EAST PECAN
                             SHERMAN, TX 75090
23

24

25       PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
       TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```

```
 1                (Open court, Defendant present.)

 2                THE COURT:  Our next case is 4:21-cr-253, the 28th

 3     defendant, United States of America versus Kingsley --

 4                Is it Oziegbe?

 5                MR. COMBS:  Jay Combs for the United States, your

 6     Honor.  The Government is ready.

 7                THE COURT:  Okay.  And for the Defendant?

 8                MR. REYES:  Gabriel Reyes for Mr. Kingsley

 9     Oziegbe, your Honor.

10                THE COURT:  Mr. Reyes, if you'll -- there should

11     be a lapel mic there.  Just make sure you use that.

12                So, sir, you are here for your sentencing pursuant

13     to your final presentence report that was filed on

14     January 31st, '24.  Have you had a chance to review the

15     final presentence report, sir?

16                THE DEFENDANT:  Yes, your Honor.

17                THE COURT:  Have you had a chance to discuss it

18     with counsel?

19                THE DEFENDANT:  Yes, your Honor.

20                THE COURT:  And do you understand it?

21                THE DEFENDANT:  Yes, your Honor.

22                THE COURT:  Do you believe the report adequately

23     covers your background?

24                THE DEFENDANT:  Yes, your Honor.

25                THE COURT:  And are you satisfied with the
```

```
 1   accuracy of the report?

 2           THE DEFENDANT:  Yes, your Honor.

 3           THE COURT:  And then, Mr. Reyes, have you had the

 4   chance to review the final presentence report, and do you

 5   believe your client understands it?

 6           MR. REYES:  Yes, your Honor.

 7           THE COURT:  And do you have any comments,

 8   additions, or corrections other than the objection you

 9   filed?

10           MR. REYES:  No, your Honor.

11           THE COURT:  On behalf of the Government,

12   Mr. Combs, any comments, additions, or corrections?

13           MR. COMBS:  No, your Honor.

14           THE COURT:  And there were no objections by the

15   Government?

16           MR. COMBS:  That's correct, your Honor.

17           THE COURT:  Okay.  So, Mr. Reyes, do you want to

18   go ahead and address your objection?

19           MR. REYES:  Yes, your Honor.

20           I have nothing more to add other than what was

21   filed.  I would just note -- draw the Court's attention to

22   two paragraphs in the PSR, paragraphs 30 and -- rather 31,

23   your Honor -- no, 30, your Honor, which notes that the

24   conspiracy here was sophisticated and he's gotten two

25   points for that.
```

1            And I would just note and supplement what I wrote.

2   The U.S. probation responded with the citation to *Coe*.   And

3   I would just note that in that case, your Honor, the

4   conspiracy was a lot -- more simpler, involved far fewer

5   codefendants than this one.   And I think it's the very

6   nature of this conspiracy and the complexity of it, your

7   Honor, that kind of mitigates what my client would know

8   about where those funds originated and who the vulnerable

9   victims may or may not have been.

10            With that, I'd rest and submit it to the Court.

11            THE COURT:   And, Mr. Reyes, I don't think you

12   actually objected to that one prior to today, did you?

13            MR. REYES:   It's not an objection, your Honor;

14   it's just an observation.   It's -- the scheme here is

15   complex, and he's gotten an enhancement for the complexity

16   of the scheme, and I think that's a factor that should be

17   considered in whether the Defendant understands the

18   totality of the scheme.

19            THE COURT:   Okay.

20            MR. REYES:   So it's more of just a note to the

21   Court that like a lot of these enhancements, they kind of

22   bleed into each other and it could be a form of double

23   counting, your Honor.

24            THE COURT:   Mr. Combs, what's the Government's

25   response to any of the objections?

1          MR. COMBS:  Well, your Honor, if we may -- may I

2    briefly put on a witness to talk a little bit about the

3    three primary victims here and the complexity and

4    sophistication of the scheme?

5          THE COURT:  Yes.

6          MR. COMBS:  All right.  The Government would call

7    Task Force Officer Christopher Mayfield.

8          THE COURT:  Okay.  Sir, if you will approach.

9          And, sir, if you will turn and raise your right

10   hand to be sworn in.

11          (The oath is administered to the witness.)

12          MR. COMBS:  May I proceed, your Honor?

13          THE COURT:  Yes.

14          MR. COMBS:  Thank you.

15          DIRECT EXAMINATION OF CHRISTOPHER MAYFIELD

16             CALLED ON BEHALF OF THE GOVERNMENT

17   BY MR. COMBS:

18   Q.  Sir, can you please state your name and spell your last

19   name for the record.

20   A.  Christopher Mayfield, M-A-Y-F-I-E-L-D.

21   Q.  And where are you employed?

22   A.  I'm employed by the City of Allen, currently assigned

23   to the FBI as a task force officer.

24   Q.  Are you involved -- have you been involved in this case

25   involving Mr. Oziegbe?

1   A.  Yes, sir.

2   Q.  Okay.  And can you just very briefly -- the Court

3   understands the scheme.  It's in the PSR.  But, generally,

4   what was the scheme here?

5   A.  Just fraud.  Romance scam was one of the original and

6   more complex parts of the organization, targeting mainly

7   elderly individuals.

8   Q.  Uh-huh.  Was there also document production, that is,

9   fraudulent driver's licenses and such that would be used to

10  further even more fraud?

11  A.  Yes.  Those were what we consider tools of the fraud.

12  Q.  Okay.  Let's talk about a victim in this case.  Are you

13  familiar with a victim whose initials are SS?

14  A.  That is correct.

15  Q.  Okay.  And was she a victim who was tied to

16  Mr. Oziegbe?

17  A.  Yes, sir.

18  Q.  Can you describe, how old was she when she was

19  victimized?

20  A.  SS was -- she is currently -- she is currently 70 years

21  old.  And she was a victim in about 2020-2021, so she was

22  in her 60s.

23  Q.  Late 60s during that time?

24  A.  That's correct, sir.

25  Q.  And is she still working now, even at 70 years old?

1    A.  Yes, sir.

2    Q.  And about how much was she victimized by Mr. Oziegbe

3    and this organization?

4    A.  I don't recall the exact amount off the top of my head

5    right now.

6    Q.  Okay.  Was it a range of about $9,500?

7    A.  That's correct, yes.

8    Q.  Is she -- and she's still working.  She's 70 years old.

9    What -- do you know kind of -- what kind of house does she

10   live in right now?

11   A.  I believe she lives in a single-wide trailer.

12   Q.  Okay.  So do you believe that $9,500 to have been a

13   significant amount to her?

14   A.  That is correct.

15   Q.  Let's talk about -- before moving on to the next victim

16   because this involves all of them -- the nature of these

17   romance fraud schemes.  Do they seek out victims based on

18   their vulnerability?

19   A.  That is correct.

20   Q.  Why?

21   A.  They're vulnerable.  Like let's say the elderly.  Women

22   outlive men, and so they know that the women are widowed.

23   They also know that most of the time they have insurance

24   payments from their deceased husband and so they have a

25   large amount of cash on hand.

```
 1            And then at this advanced age, these women are
 2   just looking for friends or companionship and they are just
 3   lonely, which makes them vulnerable to fraud.
 4   Q.  Do they tend to be more polite?
 5   A.  Yes.
 6            The older generation is just -- they were raised
 7   differently than today's generation.  They won't say no.
 8   They want to help.  They are very caught up in their
 9   religion and church, and they want to help everybody.
10   Q.  Okay.  And does that make them uniquely vulnerable to
11   fraud as well?
12   A.  Yes, sir.
13   Q.  Let's talk about BL.  Do you know a BL in this case?
14   A.  Yes.
15   Q.  Is she still alive?
16   A.  No, sir.
17   Q.  When did she die?
18   A.  January of this year.
19   Q.  So before she died, how old was she?
20   A.  She died at 72.
21   Q.  Okay.  And so when she was victimized in this case, was
22   she also elderly?
23   A.  That is correct.  69 when she was victimized.
24   Q.  And when agents interviewed her, do you know how she
25   became involved in this romance fraud?
```

 1  A.  She was identified through, if I remember correctly,

 2  bank accounts.  And when I called her and spoke with her on

 3  the phone, it became very clear that a thousand dollars was

 4  a lot of money for her.  She lived in a very rural

 5  community in Georgia, and it's just -- she did not come

 6  from wealth.

 7  Q.  Okay.  And so was it -- she also come by this off

 8  dating websites?

 9  A.  Yes, she did.

10  Q.  Okay.  Did she have any significant medical problems

11  that exacerbated her vulnerability?

12  A.  Yes.  When I interviewed her, she advised that she had

13  had a stroke and a heart attack.

14  Q.  Did she tell you that she had memory issues as well?

15  A.  She did.

16  Q.  In 2021, just a couple of years ago, late January, are

17  you aware that she sent five Zelle payments directly to the

18  Defendant?

19  A.  I am.

20  Q.  Okay.  And what is a Zelle payment?

21  A.  It's electronic transfers, just the convenience to be

22  able to use, let's say, your phone to pay some -- to move

23  money quickly from your bank account to their bank account

24  using a third-party app.

25  Q.  Did the Defendant take that money and send it right

```
 1   back to her and say, "I don't know who you are or why
 2   you're sending me money.  You need to have this back"?
 3   A.  No, sir.
 4   Q.  He kept that money, right?
 5   A.  That's correct.
 6   Q.  And then a couple days later, did he get another eight
 7   Zelle payments from her?
 8   A.  He did.
 9   Q.  This woman who is poor and living in rural Georgia with
10   memory problems?
11   A.  That is correct.
12   Q.  Let's talk about RL.  How much money do you believe she
13   was -- the Defendant's organization took from her?
14   A.  At least 30,000.
15   Q.  How do you know that?
16   A.  Because there was a photocopy of a check that was
17   recovered during the search warrant.
18   Q.  Okay.  How old is she?
19   A.  She's in her 70s.
20   Q.  So she's also elderly; is that right?
21   A.  That's correct.
22   Q.  And let's say, you know -- is her address on the check?
23   A.  It is.
24   Q.  So it would have been known to the Defendant?
25   A.  That's correct.
```

1    Q.  And had the Defendant just googled her address -- did

2    you google her address?

3    A.  I did.

4    Q.  If he had googled her address, would he have been able

5    to see where she lived?

6    A.  Yes.  It is on Google Street View.

7    Q.  And so you can readily determine --

8    A.  Yes.

9    Q.  -- what kind of circumstance she lives in.

10             Describe for the Court what kind of circumstance

11   you found her to be living in.

12   A.  So it looks to me to be a multi-family complex, brick,

13   very consistent with Section 8 housing, nothing extravagant

14   or lots of luxuries.

15   Q.  Does it look like the type of housing where somebody

16   would easily come across and be able to write a check for

17   $30,000?

18   A.  No.

19   Q.  Let's talk about the fake IDs.  Was the Defendant also

20   involved in producing fake IDs?

21   A.  It appeared so, sir.

22   Q.  Now, when somebody has -- well, let me ask you first:

23   The IDs that the Defendant had on his computer -- is that

24   right?  He had IDs on his computer?

25   A.  That's correct.

1    Q.  And those IDs, were they -- did they contain the data

2    of real people?

3    A.  They did.

4    Q.  But they have a fake picture in them; is that right?

5    A.  That is correct.

6    Q.  A picture of somebody else?

7    A.  That is correct.

8    Q.  And those people, once their data has been extracted by

9    somebody, are they already the victim of a crime?

10   A.  Most of the time they are.

11   Q.  Somebody has taken their data.

12   A.  That's correct.

13   Q.  And, in fact, did you talk to one of them with the

14   initials of TY?

15   A.  Yes.

16   Q.  And had he already been a victim of an identity crime?

17   A.  Yes.  Someone --

18   Q.  What was that crime?

19   A.  Someone attempted to file for unemployment in his name.

20   Q.  Okay.  And that -- if TY had attempted to get

21   unemployment, could that have stopped him from receiving a

22   benefit that he otherwise may have been entitled to?

23   A.  It would have.

24   Q.  Okay.  Now -- but when somebody like that has had their

25   ID stolen and now somebody is producing another identity on

Sentencing Hearing                     13

1   them, is that usually a prelude to another crime being

2   committed?

3   A.  Yes.

4   Q.  Because you're not just producing that ID for nothing.

5   Is that fair to say?

6   A.  You're producing it to -- it's part of the tool of the

7   scam, to present yourself as that individual when you're

8   not that individual.

9   Q.  Uh-huh.

10          And how about an individual by the name of BT --

11  or by the initials of BT?  Was his information recovered

12  from the Defendant's phone?

13  A.  It was.

14  Q.  Was -- now, he was not elderly himself; is that right?

15  A.  I would -- no.

16  Q.  But were his parents and their address involved in the

17  Defendant's fraud?

18  A.  That is correct.

19  Q.  How is that?

20  A.  So the -- when interviewed, he advised that the address

21  that's on the fictitious driver's license is his parents'

22  address where he used to live and hadn't lived there since

23  he graduated high school.

24  Q.  And he was already in his 50s now; is that right?

25  A.  That's correct.

Sentencing Hearing                                                        14

1   Q.  How about SG?  How old is SG?

2   A.  SG was born I believe in 1960.

3   Q.  And so he's approximately 64 years old?

4   A.  That's correct.

5   Q.  And his information was also in the Defendant's phone;

6   is that right?

7   A.  That's correct.

8           MR. COMBS:  Your Honor, that's all I have for this

9   witness.  We pass the witness.

10          THE COURT:  Any questions?

11          MR. REYES:  Yes, your Honor.

12          CROSS-EXAMINATION OF CHRISTOPHER MAYFIELD

13  BY MR. REYES:

14  Q.  Officer Mayfield, good afternoon.

15          THE COURT:  Make sure you use your mic, though.

16  BY MR. REYES:

17  Q.  Officer Mayfield, good afternoon.

18  A.  Good afternoon, sir.

19  Q.  In answering the previous questions, you were asked

20  "they" had targeted BL.  Could you specify who "they" were?

21  Do you have names for who targeted her?

22  A.  The organization.  I mean, there's people we didn't

23  even arrest.  It's an organization.  You know, they work as

24  a team.

25          "Hey, I'm looking for a bank account."

Sentencing Hearing                                                    15

1              "Can I use a bank account?"

2              "Hey, can I move this through your account?"

3              "You send it to so-and-so."

4              It's an organization.

5    Q.  Okay.  In that organizational structure, are there

6    people who are used to perhaps make contact with

7    individuals like BL or SS and not necessarily the ones who

8    receive the funds that they would then transmit?

9    A.  You're asking if someone in the organization --

10   Q.  Is it the same --

11   A.  -- targets the victims?

12   Q.  Yeah.

13             Is it the same individual who would be involved

14   with the romancing and receiving the funds, or could those

15   be two separate individuals?

16   A.  It could be two separate individuals.

17   Q.  Okay.  And when you spoke and you had the opportunity

18   before she passed to speak to BL, were you able to

19   determine whether it was one individual who had spoken to

20   her and received the funds or whether it was two

21   individuals?

22   A.  No.

23   Q.  Okay.  When you spoke to her, did you ask her whether

24   she had a Zelle account and had used Zelle or no?

25   A.  No.  We know -- we have the bank account.  When I spoke

1  with her, she was elderly and it was difficult to interview

2  her because of her memory.

3  Q.  And you said you have the bank account.  You have

4  Mr. Oziegbe's bank account or you have BL's bank account?

5  A.  We have the Zelle transfers.

6  Q.  On whose bank account, sir?

7  A.  I don't have that information in front of me.

8  Q.  Okay.  Were you able to determine whether her bank

9  account had been commandeered, hijacked?

10  A.  No.

11  Q.  Okay.  Is that a possibility?

12  A.  I don't know if it would be.  There is no indication

13  that -- are you trying to say is she controlling her bank

14  account?

15  Q.  Yes.  Was she in control of her bank account at all

16  times?

17  A.  As far as I know.  There -- there is no indication she

18  wasn't.

19  Q.  Okay.  You had an opportunity -- or you're familiar

20  with the review of Mr. Oziegbe's phone, correct?

21  A.  I have not.

22  Q.  Okay.  Would you contest if I informed you that there

23  was a card with her -- a picture of her card with her name

24  on that phone?  Would you contest that information?

25  A.  I don't -- a card?  What are you talking about?  I

Sentencing Hearing                                            17

1    don't know what you're saying.

2    Q.  A Green Dot card with a picture of (phonetic) ////////

3    //////////// name.

4    A.  On his phone?

5    Q.  Yes.

6    A.  I don't have the answer to that right now.

7    Q.  So you're not aware of that part of the investigation?

8    A.  There's so many victims I don't know if there was a

9    Green Dot card for ///////////////////// found on his phone.

10   Q.  Okay.

11   A.  I can't -- I'm not saying there wasn't.  I just don't

12   recall.

13   Q.  Are you aware that accounts were opened in ////////

14   //////////// name?

15          THE COURT:  Do you want me to go ahead and redact

16   her name out of the record?

17          MR. REYES:  I apologize, your Honor.

18          MR. COMBS:  If we could.  Yes, your Honor, please.

19          THE COURT:  Thank you.  My trusty court reporter

20   pointed that out, so thank you.

21          MR. REYES:  And I apologize, your Honor.

22   BY MR. REYES:

23   Q.  Would it refresh your recollection to show you a

24   picture from a Government presentation that was provided to

25   me?

 1  A.  Please.

 2          MR. REYES:  May I approach the witness, your

 3  Honor?

 4          THE COURT:  Yes.

 5  A.  And your question is?

 6  BY MR. REYES:

 7  Q.  Are you aware whether she was always in control of her

 8  accounts or not?

 9  A.  There is no indication to say that she was not in

10  control of her accounts.

11  Q.  Okay.  So this Green Dot account that the Government

12  spoke of during their presentation, you're saying that that

13  was not an account that was opened on her behalf?

14  A.  You're asking me if she was in control.  You're asking

15  me if she opened that account.  I have no indication to say

16  she didn't open that account.

17  Q.  Okay.  May I show you this again?

18  A.  Yes.

19  Q.  Okay.

20          When you spoke to ///////////, did she identify

21  (phonetic) FIFA1986 as her email?

22  A.  She never identified any email address.

23  Q.  Did she identify 774 -- or the telephone number that's

24  on that paper as her telephone number?

25  A.  I don't have her phone number in front of me, so I

Sentencing Hearing                                              19

1   can't tell you.

2   Q.  I only have a redacted copy of the 302.

3          Did she live in Utah, or did she live in some

4   other state?

5   A.  She lived in another state.

6   Q.  Okay.  The address on that check, what address -- what

7   state is that?  Is it Georgia, or is it Utah?

8   A.  For the account holder?

9   Q.  Yes.

10  A.  It's Utah.

11  Q.  It's Utah.  Okay.

12         Are those her personal details, to the best of

13  your knowledge?

14  A.  That's her name.  Whether or not she's ever lived in

15  Utah, I don't know.  But I do recall us talking about

16  fictitious IDs earlier.

17  Q.  Okay.  Thank you.

18         When you spoke to this individual, did you have

19  the opportunity to ask her her telephone number?

20  A.  Yeah.  I do have her telephone number, just not in

21  front of me.

22  Q.  Okay.  To the best of your recollection, was it a 404

23  area code, corresponding to Georgia?

24  A.  I don't recall.

25  Q.  Okay.  Thank you.

Sentencing Hearing                                    20

1              And just to confirm, she did identify an

2    individual who called her by name, correct?

3    A.  Yes.

4    Q.  She did identify some features of that individual,

5    correct?

6    A.  Yes.

7    Q.  But she did not make an ID of Mr. Oziegbe, correct?

8    A.  No, sir.

9    Q.  Okay.  And two final questions.  When Mr. Oziegbe was

10   arrested, he provided consent for the search of his

11   computer, correct?

12   A.  I don't remember if it was consent or if it was through

13   the search warrant.  I was not there at his arrest

14   location.

15   Q.  But you are aware that the Government is in possession

16   of his computer?

17   A.  That is correct.

18   Q.  And you are aware that the Government is in possession

19   of his mobile phone?

20   A.  That is correct.

21   Q.  Okay.  And all these transactions and all of these

22   conversations happened over what's a telephone -- either by

23   phone or computer, correct?

24   A.  That's correct.

25   Q.  Okay.  Thank you.

Sentencing Hearing                                                    21

1          MR. REYES:  No further questions.

2          THE COURT:  Anything else?

3          MR. COMBS:  No, your Honor.  Thank you.

4          THE COURT:  You may step down.  Thank you.

5          THE WITNESS:  Thank you, your Honor.

6          THE COURT:  Mr. Combs?

7          MR. COMBS:  I just have argument at this point,

8    your Honor.

9          THE COURT:  Go ahead.

10         MR. COMBS:  What I would say is, you know, the

11   Defense cites the *Coe* case and aptly so.  That's one of the

12   most applicable Fifth Circuit cases on point.  But in that

13   case the Court, when sentencing Defendant Jones -- because

14   it was Kevin Coe and Jarvis Jones who were the defendants

15   in that case.  So Jarvis Jones gets the vulnerable-victim

16   enhancement.  He objects, and he appeals on that later.

17   And the grounds were that Mr. Jones didn't speak to any

18   particular victims and so, you know, how would he know that

19   these are vulnerable victims?

20         And what the Court -- the trial court said and the

21   Fifth Circuit affirmed was that he should have known.  Here

22   is what it says at 245-246:  "However, he should have

23   recognized that that victim was vulnerable to this type of

24   scheme; he should have known this to be especially true

25   when he picked up money from the same victim eight

1    consecutive times in short succession.  The District Court

2    did not clearly err in applying vulnerable-victim

3    enhancement."

4         This Defendant didn't pick up money eight times

5    from BL; he picked it up -- as the PSR notes, he picked it

6    up 13 times over the span of two different days,

7    January 29th and February 1st of '21, five times one day

8    and eight times another day.

9         He fits the pattern of what the Fifth Circuit has

10   repeatedly said.  They said it again in *U.S. v. Allen* which

11   probation cites.  "Allen collected money in connection with

12   a fraudulent scheme from the same individual on multiple

13   occasions."  And so they found that the Court didn't err in

14   that case either and that he should have known that these

15   were vulnerable victims because of the way it was doing.

16   And the cite there is 533 Fed. Appx. 406, and that's at

17   413.

18        Finally, the Fifth Circuit recently spoke on this,

19   very recently, in fact, 2023, just this last September, in

20   a case that arose out of the Sherman Division, *U.S. v.*

21   *Moses Moreira*.  And in that case again Mr. Moreira's

22   defense was "I didn't talk to these people in this romance

23   scheme.  I don't know.  You know, the money is flowing

24   through my accounts."

25        And what it said is, "Many of the women" -- and

Sentencing Hearing                                            23

```
 1   this is at Number 2 -- said, "Many of the women were
 2   targeted on more than one occasion and made multiple
 3   transfers or deposits into bank accounts controlled by
 4   Moreira.  Thus, he at least should have known that the
 5   victim included at least one person who is a vulnerable
 6   victim."
 7         Were victims vulnerable?  Undoubtedly.  Their age,
 8   their mental -- they are infirmed.  They've had memory
 9   issues.  You know, they live in humble and difficult
10   circumstances, and their money is being taken from them
11   nonetheless.
12         So the Defendant could have -- should have known.
13   He certainly could have run a Google search on RL and seen
14   that she lives in Section 8 housing.  He could have sensed
15   that BL -- something was up because he's getting 13 Zelles
16   over the course of two days.
17         And let's talk about the Defendant because the PSR
18   makes note of who he is.  The Defendant, unlike the victims
19   in this case, is uniquely sophisticated.  He's not your
20   everyday defendant.  He's completed medical school in
21   Nigeria.  He's enrolled in clinical rotations through
22   medical school here in the United States at the time he's
23   committing this crime.  He's not just some Joe off the
24   street.  He's a guy who knows what he's doing and is headed
25   places in life.
```

1          And he didn't -- this wasn't a one- or two-time

2    thing as all the Zelles and the checks and the fake IDs

3    show.  He actually said, as paragraph 18 in the PSR notes,

4    that he wanted to be more involved.  He reaches out to the

5    main person whose phone is being tapped, Sandra Iribhogbe,

6    and he tells her that he doesn't want this to just be a

7    once or twice thing.  He says, quote, I want it to be a,

8    quote, constant thing.  And that's in paragraph 18.

9          Paragraph 20, he created fake driver's licenses.

10   Now, these people have already been victimized, and he

11   knows that.  He knows that because he's got their

12   addresses.  And so he seeks to victimize them again.

13         He operates a money exchange and, finally, he

14   operates multiple peer-to-peer financial accounts himself.

15         So he is a sophisticated individual preying on

16   unsophisticated victims.  He should be given the

17   enhancement.  It properly applies to him under Fifth

18   Circuit law and under the sentencing guidelines.

19             THE COURT:  Any additional response?

20             MR. REYES:  Your Honor, two --

21             THE COURT:  Speak into the mic, though.

22             MR. REYES:  Yes, your Honor, just two or three

23   points.

24         One, this is one of the rare times where -- AUSA

25   Combs and I agree on most things, but we have a small

Sentencing Hearing                                          25

 1  disagreement here.  I actually cited two cases in my

 2  objection.  One was *Buckman*, Eastern District of

 3  Pennsylvania.  And in that case the Court says, well, we

 4  understand what the conspiracy is.  We understand what the

 5  fraud is.  When we get to this Defendant, we just can't

 6  link it back and say that this person would have known

 7  their vulnerabilities.  That's the *Buckman* case.

 8          Understanding that that is the Eastern District of

 9  Pennsylvania, we then bring up *Coe*.  And what's significant

10  about *Coe* and very distinguishable from this case is they

11  are running a simple conspiracy.  Call someone.  Tell them

12  they won a lottery.  They have to send a wire transfer.

13  They send the wire transfer.  A runner goes to Western

14  Union, physically goes to Western Union, picks up the wire

15  transfer that's coming from a specific victim who has been

16  victimized.

17          AUSA Combs correctly lists a litany of things that

18  are going on, but these are all very different things.  The

19  lead defendant here is running a "Walmart" of fraud

20  schemes, and we don't know at any one given instance where

21  this money is coming from, who it came from, or under what

22  circumstances.

23          What we see when we look at the discovery is that

24  the Defendant is being asked to wire money sometimes to

25  other countries, sometimes to other people, sometimes in

Sentencing Hearing                        26

 1    large amounts, sometimes in smaller amounts.  Sometimes

 2    money arrives in his account unannounced.  Sometimes he's

 3    given IDs and he's asked to open accounts under those

 4    people's names.

 5           So under just a comparison to these other

 6    scenarios, what you see there are simple schemes where the

 7    Court works backwards and says, "You should have known this

 8    was the case."  And here we have multiple things going on

 9    at once and even when my client says, "I want to be more

10    involved," that's in the context of he's helping his

11    classmates -- he was in the Caribbean at that time --

12    exchange currency and he's getting a cut of those exchanges

13    and he says, "I want to be more involved with you.  I like

14    this.  This is good.  Teach me more."

15           So we're not denying that he got involved more

16    than he should have, and we're not denying that he did

17    these things.  What we're just saying is that there just

18    isn't an adequate showing of specific knowledge in this

19    case under these facts and this conspiracy and when

20    applying the enhancement, your Honor, that's what Courts

21    look at.  They look at this specific conspiracy, what's

22    happening in this case.  It's a fact-intensive analysis.

23           THE COURT:  Okay.  Thank you.

24           Okay.  I'm going to overrule the objection.  I'm

25    going to go ahead and incorporate and adopt the very

1    detailed response by Probation as well as relying upon the

2    testimony given by the agent.

3         I do think -- you know, the standard for the Court

4    is preponderance of the evidence, so is it more likely than

5    not this enhancement should have applied.  And I do think

6    under the facts of this case, it definitely should apply,

7    so I'm going to overrule the objection.

8         And I think that's your only objection, correct?

9         MR. REYES:  That's correct, your Honor.

10        THE COURT:  So, sir, you pleaded guilty to

11   Count 1, conspiracy to commit wire fraud.  To the extent

12   the Court hadn't fully accepted the Plea Agreement, the

13   Court will fully accept it now.

14        So the Court finds the information contained in

15   the presentence report has sufficient indicia of

16   reliability to support its probable accuracy.  The Court

17   adopts the factual findings, undisputed facts, and the

18   guideline applications in the presentence report.

19        Based upon a preponderance of the evidence

20   presented and the facts in the report, while viewing the

21   sentencing guidelines as advisory, the Court concludes as

22   follows:  Your total offense level is a 20, your criminal

23   history category is a I, which provides for an advisory

24   guideline range of 33 to 41 months of imprisonment.

25        And so, Mr. Reyes, I'll call upon you first to

1    comment on what you believe the appropriate sentence should

2    be.

3            MR. REYES:  Your Honor, we'd ask for a sentence at

4    the bottom of that guideline range.  We'd go further and,

5    for administrative ease, ask for a sentence of time served,

6    and here is why I make that request, your Honor.

7            My client has spent 28 months and 23 days in

8    custody.  Under 18 USC 3624(b), the Bureau of Prisons will

9    credit him 54 days for each year of imprisonment imposed by

10   this Court.

11           As the PSR notes, he's had no conduct issues.  We

12   have every reason to believe he'll receive good time credit

13   when he gets to BOP.  But the problem is that between now

14   and the time he gets transferred to BOP, the time they make

15   that calculation, if the Court were to impose a 33-month

16   sentence, he would actually serve more than the time he

17   should serve after factoring good-time credit.

18           So we would ask for that bottom-of-the-guideline

19   sentence, but we'd ask for the Court to write the Judgment

20   in a way that it is time-served.

21           THE COURT:  But I mean -- so how long has he been

22   in custody?  How many months?

23           MR. REYES:  Your Honor, he was arrested on

24   September 20th, I believe, 2021.

25           THE COURT:  The 22nd, I think, is what it shows in

Sentencing Hearing                    29

 1  the PSR but --

 2          MR. REYES:  So I have 28 months and 23 days in

 3  custody.

 4          THE COURT:  Mr. Combs, what is the Government's

 5  position?

 6          MR. COMBS:  Your Honor, for all the reasons that I

 7  already argued about, the vulnerability of the victims and

 8  the impact on those poor women, we would ask for the top of

 9  the guidelines, 41 months.  We believe that that's

10  appropriate in this case.

11          THE COURT:  Okay.  And then, sir, you have the

12  right to address the Court.  Now would be the time if you

13  wanted to say something.

14          THE DEFENDANT:  Thank you, your Honor.

15          Good afternoon, your Honor, and good day as well

16  to all of the esteemed participants in these proceedings

17  here today.  First off, I would like to wish you all a

18  successful and fulfilling new year.

19          Your Honor, I am Kingsley Oziegbe, and it is with

20  a heavy heart and mixed emotions that I stand here in your

21  courtroom today.  Primarily, I am filled with utter remorse

22  and regret for my actions that have led to this assembly

23  here today.  And that there are people, my fellow humans,

24  who have experienced hurt or loss directly or indirectly as

25  a result of my actions severely inflames these feelings in

Sentencing Hearing                                                    30

 1  me.

 2          Coming from an economically challenged country, I

 3  can understand what it means to work hard for the things

 4  you own and possess.  I have come to understand how

 5  horrible it must feel to be defrauded out of these very

 6  possessions in the manner in which members of my conspiracy

 7  have done.  I profusely apologize to everyone who has been

 8  hurt in any way, financially or emotionally, as a result of

 9  my actions.  I was a naive, headstrong youth drawn further

10  into my Codefendant Sandra's orbit by the allure of cutting

11  corners along the path of my life.  Please forgive me.

12          I also want to extend an apology to everyone who

13  has ever contributed to me being a better person than this.

14  I have let them down, something I never wanted to do.  I

15  apologize for all the hurt, pain, and disappointment that I

16  have brought.

17          Your Honor, I'm the first of four kids raised by

18  lower middle class parents, and from a young age I've

19  always been driven by those who love me towards becoming a

20  moral, responsible adult who could be the financial and

21  moral support for my family and my immediate community.

22  That factored into my decision to study and become a

23  medical doctor, the path that I and many others have

24  sacrificed a lot to keep me on.

25          My ill-advised actions and 28 months of

Sentencing Hearing                                        31

1    incarceration that has resulted from them -- it has cost me

2    not only the time but other invaluable things, such as the

3    respect and friendship of my peers and my tutors and the

4    very medical path itself.

5           I'm sort of grateful that I have learned this

6    lesson the hard way at an early age that it never pays to

7    cut corners, especially when doing so comes at the expense

8    of others.

9           I'm also more grateful that this has brought me

10   closer to God.  I made a conscious decision to be baptized

11   last year.  I have learned that His ways are good and

12   sometimes seemingly slight deviations from them can become

13   very costly to someone who doesn't heed them.

14          During the course of my incarceration, your Honor,

15   I have also studied courses like man identity and cognitive

16   awareness courses to become -- to grow and become a better

17   person morally.

18          I came into this as a very dumb youth, your Honor,

19   and I believe that this growth -- I believe that this

20   growth can allow me to leave this as a wiser young man, a

21   man unlikely to trust others blindly.  If something smells

22   fishy, it's often because it is.

23          Your Honor, it's my intention and my fervent

24   prayer to never stand again in this position in any

25   American court or any other court in the world anywhere.

1    And to do that, I intend to move forward with God's grace,

2    integrity, and as much knowledge as I can get in any

3    venture I set my hands to do.

4           Quite frankly, your Honor, if you gave me the

5    chance today to put my mistakes behind me, I will be

6    stepping forward with the mind-set that any path that even

7    smells like it could lead me back into this position again

8    I will be staying far away from.

9           Despite the severity of my mistakes, I thank God I

10   still have people in my family that believe in me and love

11   me, as my character letters attest, people that I love and

12   I can rely on to keep me honest if only for the reason that

13   I never want to break their hearts again.

14          As my mother often quoted, teach a child the way

15   that he should go, and when he is old, he will never depart

16   from it.  I have been taught first by my parents and now by

17   painful experience.  I never again want to depart from the

18   right path.

19          As I sympathize with the victims of my actions,

20   praying that they will be able to bounce back stronger from

21   their hurt, today I plead leniency from you, your Honor, a

22   chance for me, with God's help, to pick up my pieces and go

23   forth to apply myself with the knowledge that I can be a

24   better contributor to society, to be part of the solution

25   and no longer part of the problem.

Sentencing Hearing                                    33

```
 1              I will be better, your Honor.  Thank you.  Thank
 2    you for hearing me out.
 3              THE COURT:  Thank you.  You are a very well-spoken
 4    young man.
 5              Any reason why the Court should not pronounce
 6    sentence at this time?
 7              MR. COMBS:  No, your Honor.
 8              MR. REYES:  No, your Honor.  I just also wanted to
 9    note that there were two character letters submitted to
10    chambers, and I just want to make sure the Court --
11              THE COURT:  I did review those.  I'm sorry I
12    didn't -- I usually say that but I don't think I mentioned
13    that, but I did.
14              MR. REYES:  Thank you, your Honor.
15              THE COURT:  Okay.  Pursuant to the Sentencing
16    Reform Act of 1984, having considered the factors noted in
17    18 United States Code, Section 3553(a), and having
18    consulted the advisory sentencing guidelines, it is the
19    Judgment of the Court that the Defendant is hereby
20    committed to the custody of the Bureau of Prisons to be
21    imprisoned for 41 months on Count 1 of the Superseding
22    Indictment.  I did go to the high end of the guideline,
23    considering the victims and what you did in this case.
24              While incarcerated, it is recommended that you
25    participate in the Inmate Financial Responsibility Program
```

Sentencing Hearing                                                    34

1    in accordance with the requirements of the program.  If you

2    participate in the program, you shall pay 50 percent of

3    earnings per pay period to any outstanding monetary

4    penalties.

5         It is further ordered that you will make

6    restitution totaling $31,100 to the victim listed in the

7    "Restitution" section of the presentence report, which is

8    due and payable immediately.

9         Any monetary penalty that remains unpaid when

10   supervision commences is to be paid on a monthly basis at a

11   rate of at least 10 percent of your gross income.  The

12   percentage of gross income to be paid with respect to any

13   restitution and/or fine is to be changed during

14   supervision, if needed, based on your changed

15   circumstances, pursuant to 18 United States Code,

16   Section 3664(k) and/or 18 USC, Section 3572(d)(3).

17        If you receive any inheritance, any settlements

18   (including divorce settlement and personal injury

19   settlement), gifts, tax refunds, bonuses, lawsuit awards,

20   and any other receipt of money (to include, but not be

21   limited to, gambling proceeds, lottery winnings, and money

22   found or discovered), you must, within five days of

23   receipt, apply 100 percent of the value of such resources

24   to any financial penalty ordered.

25        None of the payment terms imposed by this Judgment

1    preclude or prohibit the Government from enforcing the

2    unpaid balance of the restitution or monetary penalties

3    imposed herein.

4          Upon release from imprisonment, you shall be

5    placed on supervised release for a term of two years.

6    Within 72 hours of release from the custody of the Bureau

7    of Prisons, you must report in person to the Probation

8    Office in the district where you are released.

9          You must not commit another federal, state, or

10   local crime and must comply with the standard conditions

11   that have been adopted by this Court in our General

12   Order 17-3.  In addition, you must comply with the

13   mandatory and special conditions and instructions that have

14   been provided to you and your counsel as part of the

15   presentence report prior to sentencing, which the Court

16   hereby adopts.

17         And, Counsel, did you go over our 17-3 General

18   Order?

19         MR. REYES:  Yes, your Honor.

20         THE COURT:  Any objections to those?

21         MR. REYES:  No, your Honor.

22         THE COURT:  And then would you like me to

23   recommend any placement?  I don't know if they will place

24   him, but do you want me to include a recommendation?

25         MR. REYES:  A place close to Kentucky, your Honor.

Sentencing Hearing                                    36

```
 1              THE COURT:  Do we know a facility is in Kentucky

 2    or just say Kentucky?

 3              MR. REYES:  Kentucky.

 4              THE COURT:  Okay.  I'll say Kentucky.  It is just

 5    a recommendation.

 6              THE PROBATION OFFICER:  Your Honor, I apologize.

 7    The restitution in the addendum to the presentence report

 8    was amended to $34,702, and that amount didn't make it into

 9    the new recommendation.

10              THE COURT:  What is that amount?

11              THE PROBATION OFFICER:  $34,702.

12              THE COURT:  Any cents?

13              THE PROBATION OFFICER:  No.

14              THE COURT:  Okay.  So let me correct it.  The

15    restitution amount is $34,702.

16              Any objection to that amount?

17              MR. REYES:  No, your Honor.

18              THE COURT:  And then the Bureau of Prisons

19    facility is in Lexington in Kentucky.

20              MR. REYES:  Thank you, your Honor.

21              THE COURT:  Okay.  Sir, you have the right to

22    appeal your conviction if you believe your guilty plea was

23    somehow unlawful or involuntary or if there was some other

24    fundamental defect in the proceedings that were not waived

25    by your guilty plea.
```

Sentencing Hearing                    37

 1          You have a statutory right to appeal your sentence

 2   under certain circumstances, particularly if you believe

 3   your sentence is contrary to law.  However, you can waive

 4   some of those rights as part of your Plea Agreement, and

 5   you have entered into a Plea Agreement which waives certain

 6   rights to appeal your conviction and your sentence.

 7          With the exception of the grounds reserved in your

 8   Plea Agreement, you have waived any right to appeal in this

 9   case.  Such waivers are generally enforceable, but if you

10   believe the waiver is not enforceable, you would need to

11   present that theory to the appellate court.  With few

12   exceptions, any Notice of Appeal must be filed within

13   14 days of the Judgment being entered in this case.

14          If you are unable to pay the cost of the appeal,

15   you can apply to appeal *in forma pauperis*, which is without

16   payment of fees.  And if you request assistance, the Clerk

17   of the Court will prepare and file a Notice of Appeal on

18   your behalf.

19          The presentence report is already part of the

20   record.  It's under seal.  It will remain under seal unless

21   needed for purposes of appeal.

22          Are there any charges to dismiss?

23          MR. COMBS:  Yes, your Honor.  Defendant pled

24   guilty to Count 1 of the First Superseding Indictment.  We

25   would move to dismiss all underlying indictments and other

Sentencing Hearing                                                    38

1   counts.

2          THE COURT:  Okay.  I'll grant that request.

3          And then anything further from the Government?

4          MR. COMBS:  No, your Honor.  Thank you.

5          THE COURT:  Anything further from Defense?

6          MR. REYES:  No, your Honor.  Thank you for your

7   time.

8          THE COURT:  Then, sir, you're going to go back

9   into custody of the marshals pending placement, and good

10  luck, sir.

11         THE DEFENDANT:  Thank you, your Honor.

12         (Proceedings concluded, 3:39 p.m.)

13  COURT REPORTER'S CERTIFICATION

14          I HEREBY CERTIFY THAT ON THIS DATE, OCTOBER 2,

15  2024, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

16  OF PROCEEDINGS.

17                  /s/
                    CHRISTINA L. BICKHAM, CRR, RDR
18

19

20

21

22

23

24

25